926 P.2d 1290

**In the Interest of John DOE, Born on August 6, 1987.**

**No. 18291.**

Supreme Court of Hawai'i.

Nov. 19, 1996.

As Amended on Grant of Reconsideration Dec. 6, 1996.

---

Leslie W.C. Fong and Walter R. Schoettle, on the briefs, Honolulu, for appellant.

Jay K. Goss and Kenneth Enright, Deputy Attorneys General, on the briefs, Honolulu, for appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

In this case, involving the disposition and status of a child (John Doe) under the Child Protective Act (CPA), Hawai'i Revised Statutes (HRS) chapter 587 (1993), Doe's mother (Mother) appeals from a family court order terminating her parental rights, awarding permanent custody to the Department of Human Services (DHS), and denying her motion to compel DHS to return Doe to the Philippines. Mother asserts, inter alia, that the family court never had personal jurisdiction over her enabling it to adjudicate her parental rights. We agree.

## I. BACKGROUND

This complex and unique case has been in our court system for over eight years, since March 14, 1988, when DHS filed its initial CPA petition asking the family court to determine Doe's best interests.[1] The child of a Filipina mother and an American father (Father), Doe was born in Australia on August 6, 1987. When Doe was two to three months old, he arrived in Hawai'i with Father, who was seeking reinstatement of his erroneously suspended Veterans Administration (VA) benefits. Mother returned home to the Philippines. Mother says that she reluctantly agreed to let Father take Doe because their Australian tourist visas were expiring, and because the couple mistakenly thought that Doe would need a visa to accompany her to the Philippines.

Father has a mental disability in partial remission and a history of abusing children (although not with Doe). Upon his arrival in Hawai'i, Father asked the Philippine Consulate to care for Doe. The Consulate referred him to DHS. Because he did not have adequate resources to care for Doe, Father consented to the child's placement in a DHS Emergency Shelter Home in December 1987.

On March 14, 1988, DHS filed a petition to have the family court determine Doe's best interests; a summons was issued on March 16 for Mother's appearance at a hearing thirteen days later. The summons was sent via registered mail to Mother's Philippine address; Mother received it on March 29, 1988, the scheduled hearing date. The March 29 hearing on the CPA petition was held in Mother's absence. Jurisdiction was exerted over Doe based on Hawai'i Revised Statutes (HRS) §§ 571–11(9)[2] and 587–11 (1993).[3] The family court proceeded without personal jurisdiction over Mother, observing that "technically this won't bind her because we haven't noticed her." With considerable foresight, however, the court acknowledged that "sometimes these things kind of take [on] a life of their own."

Throughout the course of five initial hearings, Mother was unrepresented and often even without notice of the proceedings. We

1. The following factual summary relies in part on *In re John Doe (born 8/6/87)* [*Doe II*], No. 15429 (mem.op.), 74 Haw. 648, 847 P.2d 263 (Haw. Feb. 19, 1993).

2. **§ 571–11 Jurisdiction; children.** Except as otherwise provided in this chapter, the court shall have exclusive original jurisdiction in proceedings:

 . . .

 (9) For the protection of any child under chapter 587.

3. **§ 587–11 Jurisdiction.** Pursuant to [section] 571–11(9), the court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to the department, which facts and circumstances constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.

 The statute was revised in 1992, in a manner which in no way affects this appeal.

described the unfolding proceedings in our prior memorandum decision in this case:

> The hearing conducted on March 29, 1988, establishing temporary foster custody in the DHS, commenced on the very date that Mother received the summons. The second hearing conducted on May 17, 1988, continuing foster custody and ordering a service plan, commenced on the twenty-first day following receipt of the summons. Although the second hearing was within the time limitations of HRS § 587–51(b)(2)(B),[4] the DHS never sought an order from the court to serve Mother by certified mail. The family court, at the second hearing, properly refused the DHS' motion to default mother.[5]
>
> Records concerning the third hearing conducted on November 16, 1988, at which the DHS announced its intention to file a motion for permanent custody, do not indicate that a return receipt was received from Mother. This failure most likely occurred because the DHS did not use Mother's known address on the summons; instead, the summons was sent to General Delivery, Manila. For the fourth and fifth review hearings, it does not appear from the record that any attempt was made to serve Mother with notice. At the fifth

hearing conducted on November 8, 1989, the family court finally ordered counsel appointed for Mother at the urging of Father's *pro bono* attorney. Not until the sixth hearing conducted on December 7, 1989, was mother, through appointed counsel, properly served and represented.

*In re John Doe (born 8/6/87)* [*Doe II* ], No. 15429, at 10–11 (mem. op.), 74 Haw. 648, 847 P.2d 263 (Haw. Feb. 19, 1993) (footnote re-numbered).[6]

Notwithstanding these difficulties, Mother nevertheless regularly corresponded with the court and with social workers, pleading for the return of her son. In a letter to DHS dated March 29, 1988, the day of the first hearing, Mother contested the fairness of the notice and requested the return of her son to the Philippines. A week later, she wrote directly to the family court and repeated her demand for the return of her child. She explained that United States immigration officials refused to recognize Mother and Father's 1987 marriage because Father had not yet divorced a previous wife; as a result, Mother was unable to obtain a visa until July 1990.

---

**4.** HRS § 587–51 (1993) contains the CPA's statutory notice requirements:

> **§ 587–51. Required findings concerning notice prior to a hearing in a child protective proceeding.** (a) No hearing may commence under this chapter unless the court enters a finding that each of the parties required to be notified pursuant to section 587–32(a) has been served with a copy of the petition; provided that if a member or members of the child's family required to be notified pursuant to section 587–32(a) have not been served, the court may proceed to hear any child protective proceeding under this chapter and enter orders concerning the parties who have been served if the court is satisfied that:
> (1) A reasonable effort has been made to effect personal service;
> (2) It would not be in the best interests of the child to postpone the proceeding until service can be effectuated; and
> (3) The child is represented by a guardian ad litem or counsel.
> (b) If, at the return date hearing, it is established that a member or members of the child's family required to be notified pursuant to section 587–32(a) have not been served prior to the return date, the court shall:
> (1) Ascertain and order the method of service of summons which the court deems to be

appropriate based upon the available information; and
> (2) Set a continued return date; provided that:
> (A) The court may waive the appearance of any party at the continued return date; and
> (B) If the court orders that service of summons be made by mail or publication, the court shall set the continued return date not less than twenty-one days subsequent to the date of service evidenced by the signature on a return receipt or the date of the last publication.
> (c) Upon the continued return date, the court shall:
> (1) Enter a default concerning a party who was served but failed to appear on the continued return date; [or]
> (2) Order the party who was served to appear on the date of the next scheduled hearing in the case[.]

**5.** "The court is reserving default of [Mother]. She's unable to come."

**6.** The family court's efforts to appoint counsel to represent Mother were hindered by her distrust of local attorneys and her desire to be represented by Father's counsel.

In January 1990, Mother sent a letter to her court-appointed attorney requesting that she *"File a Petition* to the court for our son to come here in the Philippines," objecting that "[t]he *Court* has no right to *Terminate* our rights as Parents." (Original emphasis.) After this attorney echoed back to Mother DHS' position—that she would have to "make a choice between having your son home and having your husband in the home" in order to prove she could provide a safe family home—Mother sought to fire that attorney.[7] However, the family court denied Mother's attorney's repeated motions to withdraw. (Not until January 4, 1991, after Mother again asked her attorney to withdraw, did the court finally accede.)

Although an original DHS service plan provided for family reunification, DHS's supplemental safe home guidelines expressed frustration "[w]ith [Mother's] continued residence in the Philippines and the DHS's inability to secure a valid home study, or psychological evaluation, or assess [Mother] first hand[.]" DHS eventually issued a Permanent Plan with a goal of having Doe adopted out, based in part on Mother's "continued inability to become a Hawai'i resident."

On September 5, 1990, asserting that "[n]o further continuances for any party will be allowed by the court[,]" the court continued the trial to October 24, 1990. Mother arrived in Hawai'i for the first time on September 29, 1990. On October 25, 1990, the court continued the trial indefinitely.

Early on, DHS had discovered Father's long history of child abuse and mental instability, and the department was understandably concerned about Doe's family environment and Mother's ability to intervene on Doe's behalf. Because Mother consistently affirmed her marital commitment to Father, DHS's efforts focused upon gaining assurances that Father would be kept out of her home. Mother's response was to downplay the threat posed by Father. Social studies

conducted by the Philippine Department of Social Welfare and Development recognized the threat, yet recommended returning Doe to Mother in the Philippines. There, the reports stated, Doe would be afforded additional protection by Mother's extended family, its economic stability, and the willingness of Philippine social services to intervene if trouble arose. But DHS chose to seek an order awarding permanent custody and establishing a permanent plan; Mother joined in Father's motion to compel Doe's return to Mother in the Philippines.

After numerous delays, the consolidated motions were heard between February 27 and March 1, 1991. During the hearing, the judge told counsel that they had limited time in which to present their cases because he had other matters scheduled. Examination of the state's seven witnesses exhausted some seventy percent of the time allotted by the judge. Mother's attorney was only able to call three witnesses: Mother, Father, and a psychologist. Direct examination of Mother was curtailed by the judge due to time constraints. Because of these constraints, moreover, Mother's attorney was given the choice of calling either Father or Doe's foster mother. At the end of the hearing, the court ruled against Doe's parents, terminated their parental rights, and awarded the DHS permanent custody of Doe. The court denied Mother's subsequent motion for reconsideration, and the Intermediate Court of Appeals (ICA) affirmed.

On February 19, 1993, however, this court held that "[t]he cumulative effect of the procedural inequities and the circumstances surrounding this case leads us to conclude that Mother's due process rights were violated." *Doe II*, at 12.[8] Accordingly, we vacated the family court's order granting the DHS permanent custody and remanded "for a new hearing on both the motion to compel the DHS to return Doe with Mother to the Philippines and the motion to award permanent

---

7. Mother complained to her attorney by mail that "you are stating what the DHS is going to do to our child. You did not state what you can do for us in getting our child back.... I do not need a lawyer who does not argue in my behalf."

8. Without discussion, we affirmed those portions of the ICA's opinion holding that (1) the family court's finding that the DHS employed reasonable efforts to reunite the family was not clearly erroneous, 'and (2) the DHS's decision not to return Doe to Mother in the Philippines was not a denial of Mother's equal protection rights.

custody to the DHS and the establishment of a permanent plan." *Id.* at 13. In addition, we agreed with the ICA that the family court had a sufficient basis for exercising *subject matter* jurisdiction based on the threatened harm to Doe. Father's appeal was determined to be without merit; accordingly, only Mother's parental rights remain at issue.

On April 13–15, 1994, the family court held a new trial. Mother's trial memorandum correctly informed the court that the personal jurisdiction issue had not been resolved because she had been denied due process and had not yet had an adequate opportunity to present the issue. Mother asserted that the court did not have jurisdiction over her and thus could not adjudicate her parental rights. The DHS replied that HRS chapters 571 and 587 "provide a clear basis for jurisdiction." The family court concluded that it had personal jurisdiction and again granted DHS permanent custody, establishing a permanent plan, and denied the motion to compel Doe's return to the ,Philippines. This appeal followed.

## II. *DISCUSSION*

Mother contends that the due process clause of the fourteenth amendment to the United States Constitution precludes the family court from exercising personal jurisdiction over her as a nonresident, non-domiciliary parent who is a citizen of a foreign country with insufficient contacts with the State of Hawai'i.[9] DHS argues that Mother waived her defense of lack of personal jurisdiction by (1) failing to specifically challenge the family court's personal jurisdiction over her, and (2) fully participating in the proceedings.

### A. *Mother Did Not Waive Her Defense Of Personal Jurisdiction During The Original Proceedings.*

■ Mother is a citizen and resident of a foreign country. As is clear from the above factual summary, Mother has resisted the court's authority to terminate her parental rights from the outset. She had no contact

with Hawai'i when DHS filed the CPA petition and notified her of the impending proceedings to terminate her parental rights. Mother was required to travel to Hawai'i as a prerequisite to reunification with her child; notwithstanding her known visa difficulties, DHS held Mother's absence against her. In addition, Mother wrote to the court challenging its authority to terminate her parental rights. Mother was dissatisfied with her legal representation, in part because her court-appointed attorney failed to recommend appropriate legal action to return Doe to the Philippines and instead echoed DHS' position in the case. On these facts, and in light of our holding in *Doe II* that Mother's due process rights were violated by the original proceedings, we decline to hold that Mother waived the defense of personal jurisdiction.

### B. *Mother Did Not Waive Personal Jurisdiction On Remand.*

■ Hawai'i Family Court Rules (HFCR) Rule 12(b)(2) (1982) provides that

> [e]very defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may *at the option of the pleader be made by motion:* ... lack of jurisdiction over the person.... A motion making any of these defenses shall be made before pleading if further pleading is permitted. *No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion.*

(Emphasis added). As noted above, Mother raised the issue of personal jurisdiction in her trial memorandum at the family court proceeding held on remand from our decision in *Doe II.* The better practice would be to file a motion to dismiss for lack of personal jurisdiction, rather than raising the defense in a trial memorandum. However, HFCR Rule 12(b)(2) does not mandate, and we decline to hold, that the latter course amounted to Mother's waiver of personal jurisdiction.

---

9. In the alternative, Mother claims that several of the family court's findings of fact are clearly erroneous.

## C. Due Process Restrictions Preclude The Exercise Of Personal Jurisdiction Over Mother.

■ A trial court's determination to exercise personal jurisdiction "is a question of law reviewable *de novo* when the underlying facts are undisputed." *Shaw v. North Am. Title Co.*, 76 Hawai'i 323, 326, 876 P.2d 1291, 1294 (1994).

The instant case concerns Mother's ability to provide a safe home for her child under the CPA. HRS section 587–11 (1993) provides the relevant jurisdictional authority:

> § 587–11 **Jurisdiction.** Pursuant to [section] 571–11(9), the court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to the department, which facts and circumstances constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.

On its face, this statute allows a court to exercise jurisdiction over any child "found within the State[.]" Doe was clearly "found within the State," and Mother does not dispute that the family court had jurisdiction under this provision.

■ In order for an exercise of jurisdiction under section 587–11 to be valid, however, it must comply with federal due process requirements. A court's power to exercise jurisdiction over non-residents is limited by the operation of the fourteenth amendment's due process clause. *See, e.g., Cowan v. First Ins. Co. of Hawaii, Ltd.*, 61 Haw. 644, 654, 608 P.2d 394, 401 (1980). Restrictions on a court's personal jurisdiction

> are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts'

with that State that are a pre-requisite to its exercise of power over him.

*Kailieha v. Hayes*, 56 Haw. 306, 307–08, 536 P.2d 568, 569–70 (1975) (emphasis omitted) (quoting *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283, *reh'g denied*, 358 U.S. 858, 79 S.Ct. 10, 3 L.Ed.2d 92 (1958)); *Gordon v. Granstedt*, 54 Haw. 597, 602, 513 P.2d 165, 168 (1973).

■ In *Shaw*, we outlined the due process restrictions on the exercise of personal jurisdiction as they have been developed by the United States Supreme Court:

> Due process requires that a nonresident defendant have sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (citation omitted). "'[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)). The determining inquiry is whether "'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* at 474, 105 S.Ct. at 2183 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). There is no "talismanic jurisdictional formula" and the court weighs each case on its facts. *Id.* at 485–86, 105 S.Ct. at 2189 (citation omitted).

76 Hawai'i at 329–30, 876 P.2d at 1297–98. "[A]n essential criterion in all cases is whether the quality and nature of the defendant's activity is such that it is reasonable and fair to require him to conduct his defense in that State." *Kulko v. California Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132, *reh'g denied*, 438 U.S. 908, 98 S.Ct. 3127, 57 L.Ed.2d 1150 (1978) (internal quotation marks and citations omitted).

Whether the exercise of jurisdiction comports with due process depends on the facts of the particular case. *Shaw,* 76 Hawai'i at 330, 876 P.2d at 1298.

 A person may be subject to personal jurisdiction in either of two ways. First, general jurisdiction exists where a defendant has continuous and systematic contacts with the forum; the exercise of jurisdiction in such a case does not offend traditional notions of fair play and substantial justice. *See, e.g., Core–Vent Corp. v. Nobel Industries AB,* 11 F.3d 1482, 1485 (9th Cir.1993). There is no question that Mother's contacts with Hawai'i are insufficient to allow the exercise of general jurisdiction over her.

 If a defendant's contacts with the forum are not continuous and systematic, the forum may exercise only specific jurisdiction, and due process requires application of the following three-part test:

(1) The nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Reebok Int'l Ltd. v. McLaughlin,* 49 F.3d 1387, 1391 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 276, 133 L.Ed.2d 197 (1995); *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 206 (1st Cir.1994). Applying the test for specific jurisdiction to the facts of this case clearly indicates that the exercise of personal jurisdiction over Mother was improper.

 First, Mother has neither purposefully directed an act toward, nor availed herself of the privilege of conducting activities in, the State of Hawai'i. "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of a third person." *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183. "Purposeful availment analysis examines whether the defendant's contacts with the forum are attributable to his own actions or are solely the actions of the plaintiff." *Sinatra v. National Enquirer,* 854 F.2d 1191, 1195 (9th Cir.1988) (citations omitted); *Sunbelt Corp. v. Noble, Denton & Assoc., Inc.,* 5 F.3d 28, 32 (3d Cir.1993). Doe's presence in Hawai'i in the first instance was a consequence of Father's journey to the nearest location in the United States where he could resolve his problem with the federal government. Mother never arrived in this state prior to the commencement of these proceedings.

Second, given the absence of any forum-related activity by Mother, this cause of action obviously cannot arise out of or relate to that activity.

Finally, exercising personal jurisdiction over Mother in such circumstances simply would not comport with "fair play and substantial justice." In determining whether the exercise of jurisdiction over a nonresident defendant is "reasonable," the federal Ninth Circuit Court of Appeals has considered seven factors: (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of any conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) concerns of judicial efficiency; (6) the significance of the forum to the plaintiff's interest in relief; and (7) the existence of alternative fora. *See, e.g., Caruth v. International Psychoanalytical Ass'n,* 59 F.3d 126, 127 (9th Cir.1995); *Reebok,* 49 F.3d at 1391; *Core–Vent,* 11 F.3d at 1487. *Compare Pritzker v. Yari,* 42 F.3d 53, 60 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995) (five-part test). None of the factors is solely dispositive; all seven are weighed in the factual circumstances in which they arise. *Core–Vent,* 11 F.3d at 1487; *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir.1991). In this case, few of the factors weigh in favor of the exercise of jurisdiction over Mother.

## 1. Extent of Purposeful Interjection

As described above, Mother never entered Hawai'i prior to the commencement of the CPA proceedings. She is a citizen and resident of the Philippines. Except for the present proceedings, Mother had no connections with Hawai'i. She has no relatives or business ties here. Mother came to Hawai'i solely in an effort to retrieve her son, Doe.

## 2. Burden on Defendant

In *Asahi Metal Indus. Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987), the United States Supreme Court held that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." Mother faces a considerable burden defending the suit in Hawai'i. Furthermore, potential witnesses and evidence are located in the Philippines.

## 3. Conflict with Sovereignty of Defendant's State

 Where the defendant is from a foreign nation rather than another state, the reasonableness of exercising personal jurisdiction is significantly diminished. *Theunissen v. Matthews,* 935 F.2d 1454, 1460 (6th Cir.1991); *Pacific Atl. Trading Co. v. M/V Main Exp.,* 758 F.2d 1325, 1330 (9th Cir. 1985). "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi,* 480 U.S. at 115, 107 S.Ct. at 1034 (quoting *United States v. First Nat'l City Bank,* 379 U.S. 378, 404, 85 S.Ct. 528, 542, 13 L.Ed.2d 365 (1965) (Harlan, J., dissenting)). While this factor cannot be given controlling weight, "a foreign nation presents a higher sovereignty barrier than another state within the United States." *Garcia Marquez,* 942 F.2d at 623 (quoting *FDIC v. British–American Ins. Co., Ltd.,* 828 F.2d 1439, 1444 (9th Cir.1987)). In this case, DHS has forced a citizen of the Philippines to come to a foreign country and wage an ongoing battle in an unfamiliar court system to avoid permanently losing her child. The international context of this case leans strongly in favor of Mother.

## 4. Forum State's Interest

Noting that the State of Hawai'i has a compelling interest in protecting children from abuse, the state argues that "Doe, as the natural born child of an American citizen ... is also an American citizen and entitled to all of the protections that other American children are entitled to." The state contends that "the court could not place John Doe, who was an American citizen, into an unsafe home simply because his mother was a citizen of the Philippines."

The state's claim that it has an interest in Doe's well-being is not without merit. But what the state fails to take into account is that the debate is not about whether the court had jurisdiction over Doe; Mother claims that the court never had personal jurisdiction over herself. Mother suggests that we

consider the reverse situation, where a child of a United States citizen is being held in a foreign country, say Iran, upon allegations that the U.S. citizen was unable to provide a safe home for the child. Would it be appropriate for the Iranian court to send a certified letter to the U.S. citizen and demand that she appear in an Iranian court applying Moslem law to the care and custody of children? Would it be appropriate for the Iranian court to require that the U.S. citizen establish residence in Iran and take courses in Moslem religion and law in order to prove that she is a fit and proper parent?

For that matter, we do not doubt that DHS would need to do more than provide statutory notice to a California resident mother of a child from California, vacationing in Hawai'i with its out-of-state resident father and being abused here, before it could terminate her rights as a parent and permit her child to be adopted.

The fact is that neither of Doe's parents were Hawai'i residents; Doe is a resident of this state only as a result of these proceedings. In the present situation, the state's interest was insufficient to justify the exercise of personal jurisdiction. The state's ar-

gument amounts to the invocation of personal jurisdiction over a foreign national based solely on the fortuitous and transitory presence of her child, a kind of *quasi in rem* jurisdiction. But the United States Supreme Court has applied the minimum contacts analysis to *quasi in rem* as well as *in rem* judgments. *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Hawai'i does not gain personal jurisdiction over Mother by the mere transitory presence of her offspring.

### 5. Most Efficient Judicial Resolution

This factor involves a comparison of alternative forums. *Pacific Atl. Trading*, 758 F.2d at 1331. The interest in obtaining the most efficient resolution of this controversy points away from Hawai'i. "The site where the injury [might] occur[ ] and where evidence is located usually will be the most efficient forum." *Id.* To the extent that Philippine law may apply, a Philippine forum would be more efficient. *Id.; cf. Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996) ("American courts aren't in the best position to assess the effects of parental behavior under foreign law.").

### 6. Convenient and Effective Relief for Plaintiff

The state itself being the plaintiff in this case, this factor is identical to the forum state's interest factor.

### 7. Existence of Alternative Forum

■ The burden of proving the unavailability of an alternative forum is on the plaintiff. *Garcia Marquez*, 942 F.2d at 624; *Pacific Atl. Trading*, 758 F.2d at 1331. The state has not met this burden.

■ In conclusion, few if any factors involved in the due process analysis favor the state's exercise of jurisdiction over Mother. We are aware of the cases supporting the proposition that personal jurisdiction over a nonresident parent is not required for certain "status" determinations—such as child custody under the Uniform Child Custody Jurisdiction Act (UCCJA)—so long as the nonresident receives sufficient notice and an opportunity to participate in the proceedings. *See, e.g., Balestrieri v. Maliska*, 622 So.2d 561, 563 & n. 1 (Fla.App.1993); *In re S.A.V.*, 837 S.W.2d 80, 84 (Tex.1992); *Martinez v. Reed*, 490 So.2d 303, 306 n. 1 (La.App.1986); *In re Marriage of Leonard*, 122 Cal.App.3d 443, 175 Cal.Rptr. 903 (1981). The United States Supreme Court has noted that the preceding due process analysis may not necessarily limit "jurisdictional doctrines other than those discussed . . ., such as the *particularized rules governing adjudications of status* [.]" *Shaffer*, 433 U.S. at 208 n. 30, 97 S.Ct. at 2582 n. 30 (emphasis added) (citation omitted). A principal purpose of the UCCJA, however, is "to have custody litigation take place in the state where the child and his family have the closest connection." *Balestrieri*, 622 So.2d at 563; *see also Hart v. Hart*, 236 Kan. 856, 695 P.2d 1285, 1287 (1985); HRS § 583–3. The Texas Supreme Court has articulated the general rule that "a family relationship is among those matters in which the forum state has such a strong interest that its courts may reasonably make an adjudication affecting that relationship *even though one of the parties to the relationship may have had no personal contacts with the forum state.*" *In re S.A.V.*, 837 S.W.2d at 84 (emphasis added). But such cases do not involve the exercise of personal jurisdiction in a situation in which *neither* parent ever was or intended to be a resident of the state. *Compare Allen v. Allen*, 64 Haw. 553, 561, 645 P.2d 300, 306 (1982) ("Physical presence of the child and one of the contestants is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination[.]") (citation and internal quotation marks omitted); *see also In Interest of M.A.C.*, 244 Ga. 645, 261 S.E.2d 590 (1979) (personal jurisdiction properly exercised over former state resident who left her children in that state's custody for several years). Here, the particular family relationship over which the State of Hawai'i asserts a compelling interest never existed within its jurisdiction because neither of the parents resided in or was domiciled in Hawai'i. The policy underlying the foregoing cases simply does not apply to the present case.

In *Kulko v. California Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), the United States Supreme Court held that the right to due process under the fourteenth amendment precluded the California courts, in a child support case, from exercising personal jurisdiction over a non-resident parent of children domiciled within the forum state. The *Kulko* court noted that the non-resident had caused no injury in California, sought no commercial benefit there, and had not visited the state in many years. *Id.* at 96–97, 98 S.Ct. at 1699. "[A]ppellant did no more than acquiesce in the stated preference of one of his children to live with her mother in California. This single act is surely not one that a reasonable parent would expect to result in the substantial financial burden and personal strain of litigating a child-support suit in a forum 3,000 miles away[.]" *Id.* at 97–98, 98 S.Ct. at 1699–1700. Similarly, here, Mother has done no more than acquiesce in Doe's travel to Hawaiʻi for a visit intended to be brief. We cannot say on these facts that "the quality and nature of [Mother's] activity is such that it is reasonable and fair to require [her] to conduct [her] defense in [this] State." *Id.* at 92, 98 S.Ct. at 1697. In these circumstances, the exercise of personal jurisdiction over Mother was improper.

We hold that, in the context of CPA proceedings involving parents who are neither resident nor domiciled in Hawaiʻi, personal jurisdiction may not be exercised over a parent pursuant to HRS § 587–11 to terminate their parental rights unless the preceding due process requirements are satisfied. We stress that our decision is not to be interpreted inconsistently with our opinion in *Doe II*, wherein we affirmed both the termination of Father's parental rights and the court's subject matter jurisdiction; moreover, DHS retains foster custody of Doe.

## III. CONCLUSION

Because it would be unreasonable and unfair for a Hawaiʻi court to assert personal jurisdiction over Mother, we vacate the family court's order denying Mother's motion to compel DHS to return Doe to the Philippines, terminating Mother's parental rights, and granting the DHS permanent custody.