823 A.2d 817 (2003)
360 N.J. Super. 426
DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
M.Y.J.P. and J.R.A., Defendants-Appellants.
In the Matter of the Guardianship of S.J.A.
Superior Court of New Jersey, Appellate Division.
Argued October 17, 2002.
Decided May 27, 2003.
*819 William J. Sweeney, Westfield, Designated Counsel, argued the cause for appellant J.R.A. in 3402-01 (Yvonne Smith Segars, Public Defender, attorney; Mr. Sweeney, on the brief).
Marty M. Judge, Princeton, argued the cause for appellant M.Y.J.P. in 3875-01 (Drinker Biddle & Shanley, attorneys; Mr. Judge, of counsel; Mark P. Luedeke, on the brief).
Mary Jane Lembo Cullen, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Acting Attorney General, attorney; Michael J. Haas, Assistant Attorney General, of counsel; Ms. Cullen, on the brief).
Before Judges KESTIN, EICHEN and FALL.
*818 The opinion of the court was delivered by KESTIN, P.J.A.D.
M.Y.J.P. and J.R.A. are, respectively, the biological mother and father of S.J.A. They have appealed separately from a judgment terminating the parental rights of each and granting guardianship of S.J.A. to the Division of Youth and Family Services (DYFS or the Division). *820 The appeals have been consolidated. The trial court's decisional rationale was expressed by Judge Council orally on February 1, 2002 and in a detailed written opinion filed on that date.
The child's mother, M.Y.J.P., is a Haitian citizen residing in Haiti. The father, J.R.A., is a Haitian citizen who, when the operative facts occurred and at the time of trial, resided in New Jersey. M.Y.J.P. argues the trial court erred in rejecting her motion to dismiss the complaint as to her for lack of in personam jurisdiction, in violating her procedural due process rights, and in denying her a fair trial. She also argues that the trial court erred in admitting into evidence the testimony of DYFS's bonding expert. M.Y.J.P. and J.R.A. both argue that the trial court erred in terminating their parental rights because the Division did not prove each of the four required elements of N.J.S.A. 30:4C-15.1a; see also Division of Youth and Family Servs. v. A.W., 103 N.J. 591, 604-11, 512 A.2d 438 (1986), as to each of them.

I
When the child, S.J.A., was born on August 5, 1992, his mother, M.Y.J.P., was twenty years of age and his father, J.R.A. was twenty-eight. The parents had begun dating in 1990, when M.Y.J.P. was a student at a school in Port-au-Prince, in which J.R.A. was employed as a teacher. In November 1991, M.Y.J.P. became pregnant and returned to her father's home in the province of L'Acul du Nord. J.R.A. remained in Port-au-Prince, where he married W.A. M.Y.J.P. testified during a de bene esse deposition that her father and siblings assisted her in the care of S.J.A., and thus, despite a United States embargo related to the civil unrest in Haiti at the time, the child was never without food and clothing. J.R.A. did not visit or maintain any contact with S.J.A. while the child was in L'Acul du Nord.
In May 1994, at J.R.A.'s request, M.Y.J.P. and S.J.A. returned to Port-au-Prince where they resided with M.Y.J.P.'s aunt. M.Y.J.P. testified that, at the time, conditions in Port-au-Prince were dangerous and violent; that she was often afraid; and that she had problems obtaining sufficient food for S.J.A. Around that time, J.R.A. asked M.Y.J.P. whether she would allow S.J.A. to go to the United States with him and S.J.A.'s half-brother J.R.A., Jr. M.Y.J.P., who by then had learned of J.R.A.'s marriage, agreed, but insisted that J.R.A. send for her as soon as possible, which he said he would do. M.Y.J.P. testified that she would not have allowed S.J.A. to leave Haiti if she had known that J.R.A. would not send for her.
The child arrived in the United States in July 1994 with his father, J.R.A., accompanied by the father's wife, W.A., and J.R.A.'s other child, J.R.A., Jr., who was about four years older than S.J.A. Their entry was sponsored by the Lutheran Ministries Haitian Refugee Program (Lutheran Ministries), and they settled in New Jersey. J.R.A. did not send for M.Y.J.P.; and W.A. left J.R.A. shortly after their arrival, leaving J.R.A. as the primary caretaker of the children.
DYFS first became involved with the family on October 20, 1994, when it received a referral from Lutheran Ministries that J.R.A. had left the children home without adult supervision. Lutheran Ministries assisted J.R.A. in arranging for child care. Thereafter, on November 16, 1994, DYFS received a second referral, from the principal at J.R.A., Jr.'s school, reporting that the child had a red and swollen left ear. DYFS sent J.R.A., Jr., to a hospital for examination. The examination disclosed that J.R.A., Jr. had old scars on his chest, back, and arms. J.R.A. admitted *821 he had used corporal punishment, and refused to stop doing so because he maintained that such punishment was acceptable in Haiti. A DYFS case manager noted at the time that "[w]hen the children are in [J.R.A.'s] presence, neither child smiles or talks and they both display fear of him and their affects are flat."
At that point, DYFS recommended placing J.R.A., Jr. in a foster home, to which J.R.A. agreed, stating, according to DYFS personnel, that if the Division did not accept J.R.A., Jr., who had been having behavioral problems at home and at school, he would abandon the child. J.R.A. also insisted that DYFS place the children in the same foster home because he said they had a close relationship and separation would have an adverse effect on S.J.A. J.R.A. then signed a voluntary placement agreement, written in English, and the children were placed in foster care. J.R.A. testified to his understanding that he could retake custody of S.J.A. "[a]nytime."

II
This matter commenced on June 4, 1998, with DYFS's complaint for guardianship of S.J.A., then almost six years of age, and his ten-year-old half-sibling, J.R.A., Jr.[1] On June 18, 1998, DYFS mailed a summons and copy of the complaint, written in English, to M.Y.J.P. in Haiti. M.Y.J.P. is fluent only in Creole. In the accompanying cover letter, DYFS advised M.Y.J.P. that if she could not afford an attorney one would be appointed at no cost, cautioned her that if she did not appear in court her parental rights would be terminated, and informed her that a hearing would be held on September 24, 1998.
By letter handwritten in English, dated June 26, 1998, M.Y.J.P. responded[2] that she had read the documents "carefully" and appreciated the fact that DYFS was "interested in [S.J.A.'s] parental rights and his future too." She requested that an attorney be appointed on her behalf and asked for a photograph of her son.
On September 24, 1998, the trial court conducted a case management conference and directed DYFS to provide M.Y.J.P. with notice of the next court date. On October 5, 1998, DYFS mailed a second summons and complaint written in English to M.Y.J.P. The accompanying cover letter stated that a hearing had been set for October 22, 1998. M.Y.J.P. responded by letter dated October 19, 1998, once again asking DYFS to appoint an attorney for her because she was a "moneyless person." She indicated that she had not received the October 5 letter until October 14, and that she had read the documents carefully as I am told.

* * *
I appreciate a lot for the decision you want to make to determinate my child parental rights. So I must tell you sincerely I feel a little bit sad because I am not able to attend the hearing. And I know a hearing is never held by one part or one person ... [so] could you help me in order to attend the hearing. [sic]
In orders entered on October 22, 1998, and December 9, 1998, the trial court appointed counsel for the respective parents and designated the guardian ad litem. On November 13, 1998, the court, following on another case management conference, ordered, *822 inter alia, psychological and bonding evaluations of J.R.A., the two children, and the foster parents of the children at DYFS's instance. The order also provided for the retention of experts to perform evaluations on behalf of "the defendant," if requested. All evaluations were to be completed by January 1,1999.
In January 1999, counsel for M.Y.J.P. raised the issue of personal jurisdiction. By order entered on January 28, 1999, the court directed DYFS to pay for a translator to assist defense counsel in communicating with M.Y.J.P. and directed DYFS to seek assistance from the American Embassy in Haiti in communicating with M.Y.J.P. The court reserved decision on the issue of jurisdiction.
After another case management conference, the court, on March 30, 1999, ordered that the petition regarding J.R.A., Jr. be accelerated while consideration of the jurisdictional argument in S.J.A.'s case pended. In June 1999, M.Y.J.P. filed a motion to dismiss the complaint as to her for lack of jurisdiction over the person.
On August 5 and 11, 1999, the court tried the guardianship petition regarding J.R.A., Jr. The father, J.R.A., who had been incarcerated in the Mercer County Correctional Facility, appeared by writ on August 5, but did not appear on August 11, 1999, after he had been released. At the conclusion of the trial, the court terminate ed J.R.A.'s and I.C.'s[3] parental rights to J.R.A., Jr., and a judgment of guardianship was entered on August 25, 1999. No appeal from that judgment was filed.
In a letter dated June 22, 2000, the trial court judge sent counsel for M.Y.J.P. and the Division a written decision denying M.Y.J.P.'s motion to dismiss the guardianship complaint for lack of in personam jurisdiction to the extent it sought termination of her parental rights as to S.J.A. The Court determined that New Jersey had a parens patriae interest in the best interests of the child. This determination was based on findings that the child, born in Haiti on August 5, 1992, had come to the United States with M.Y.J.P.'s permission and in the care and custody of J.R.A., then accompanied by his wife, W.A.; that, in 1994, J.R.A. placed the child and his half-sibling into foster care in this State; and that J.R.A. was incarcerated in 1994 "and has had little or no contact with either child during the past six years." The court found further that M.Y.J.P.
has not seen her child or had any contact with him since he left Haiti. She has never visited the United States and the child has never visited Haiti. She speaks very little English, and the child does not speak Creole. More important, M.Y.J.P. has no plans for the child's future, and does not wish to have the child returned to Haiti.
The court also determined that DYFS had given M.Y.J.P. sufficient notice of the guardianship complaint and that M.Y.J.P. had sufficient "minimum contacts" with the State of New Jerseynamely, her receipt of services by DYFS in caring for S.J.A. so as not to offend "traditional notions of fair play and substantial justice."
At counsel's request, the court delayed issuance of an order to allow counsel time to discuss with M.Y.J.P. the filing of an interlocutory appeal. The court ultimately entered an order on September 12, 2000.
On October 2, 2000, M.Y.J.P. filed a motion for leave to appeal, for summary disposition, and for a stay. We denied the motion. Thereafter, on November 22, 2000, M.Y.J.P. filed a notice of motion with the New Jersey Supreme Court for leave to appeal and for a stay pending final *823 disposition. The Court denied that application, with two justices dissenting.
In ensuing case management conferences, the trial court mandated bonding evaluations of M.Y.J.P., S.J.A., and the foster parent, and ordered defense counsel to "attempt to arrange for M.Y.J.P. to travel to New Jersey for the purpose of trial[.]" The court recognized, however, that M.Y.J.P. might be unable to obtain a visa to enter the United States, and therefore also ordered the parties to "prepare to proceed with her testimony by phone."
On March 13, 2001, ruling on a short notice motion filed on behalf of M.Y.J.P., the court entered an order establishing trial procedures. The order provided, inter alia, that M.Y.J.P. "shall appear at trial by telephone." The arrangements were to be made by the Administrative Office of the Courts. The order also provided that, if telephone participation were not possible
alternative procedures shall be adopted before the trial commences to satisfy minimal due process standards; and
Upon notice by counsel to the Court, [M.Y.J.P.] may request a brief adjournment of the trial at the end of each witness's testimony (or sooner, if necessary to raise or meet an objection) to confer with her counsel privately; and
All witnesses shall be instructed that [M.Y.J.P.] is participating at trial by telephone and with the aid of a translator and that during testimony the witness shall be cognizant of and cooperate with the translator[.]
The order concluded with the following provision, sought by M.Y.J.P. and unobjected to by DYFS:
No testimony or other proofs adverse to [M.Y.J.P.] may be proffered at trial by any party regarding [M.Y.J.P.]'s fitness as a parent and her relationship to her son.
In advance of a March 30, 2001 case management conference, the Mercer County trial court administrator advised the judge in a memorandum that he had not been successful in obtaining a temporary visa for M.Y.J.P. to allow her to be present at trial, and that Haiti lacked the telephonic or technical capabilities to enable M.Y.J.P. to participate in the trial by telephone. Accordingly, the court acknowledged that further, specially tailored procedural safeguards needed to be formulated for the trial to proceed in the likely absence of M.Y.J.P.
As a result, on May 30, 2001, DYFS filed a motion seeking to set a trial date, to proceed in the absence of M.Y.J.P., and to implement alternative procedural safeguards to address M.Y.J.P.'s inability to participate personally in the trial. In response, on May 31, 2001, M.Y.J.P. filed a motion, on short notice, for dismissal of the guardianship action "because of the impossibility of providing trial procedures that satisfy procedural due process under the United States and New Jersey Constitutions," or, in the alternative, for implementation of long-term foster care for S.J.A.
After oral argument on the motion on July 13, 2001, the judge found that "the welfare of the child outweighs [M.Y.J.P.'s] interest ... [in] physically being present for trial" and that the court could proceed in M.Y.J.P.'s absence "provided that we have procedural safeguards in place." By order entered on July 16, 2001, the court set forth the following trial procedures:
1) The Division shall present its case-in-chief.
2) Defendants [M.Y.J.P. and J.R.A.] shall be permitted to cross-examine the Division's witnesses.
3) A transcript of (1) and (2) shall be prepared.

*824 4) The transcript shall be translated from English to Creole.[4]
5) A recess shall be had and [M.Y.J.P.'s] counsel shall have the opportunity to review the transcript with their client.
6) Counsel for [M.Y.J.P.] shall be permitted to call back the Division's witness(es) for cross-examination of issue(s) that are raised in consultation with [M.Y.J.P.].
7) [J.R.A.] (Birth Father) shall be permitted to testify.
8) [M.Y.J.P.] shall be permitted to testify through one of the following methods:
a) Defense counsel shall be permitted to arrange a telephone deposition of their client; or
b) Defense Counsel shall be permitted to retain counsel in Haiti to conduct a deposition of [M.Y.J.P.]; or
c) Defense Counsel shall be permitted to travel to Haiti to conduct a video deposition of [M.Y.J.P.].
Counsel for M.Y.J.P. ultimately arranged for her video-taped de bene esse deposition.
Shortly before the scheduled date of trial, M.Y.J.P. moved for an order excluding the testimony of the Division's bonding expert, Wendy Matthews, Ph.D., on the grounds that exclusion was necessary "to create a level playing field[;]" that Dr. Matthews had not evaluated the bond between M.Y.J.P. and S.J.A., and that Dr. Matthews lacked any factual predicate upon which to opine relative to the bonding, vel non, between M.Y.J.P. and S.J.A. The trial court denied that motion on August 6, 2001.
Two days of trial were held on August 6 and 7. The proceedings were then recessed so that the Creole version of the testimony could be sent to M.Y.J.P., and to allow for M.Y.J.P.'s video de bene esse testimony, which was conducted on August 30, 2001. The trial resumed on September 10, 11, and 12, 2001. Closing arguments were heard on December 3, 2001. For reasons summarized orally on February 1, 2002 and stated comprehensively in a written decision of the same date which embodied extensive findings of fact and conclusions of law, the court terminated the parental rights of M.Y.J.P. and J.R.A., placing S.J.A. in the guardianship of DYFS. On February 20, 2002, the court entered a final judgment of guardianship memorializing its determinations.

III
The evidence at trial produced a coherent story regarding DYFS's involvement with the parents and the child, and each parent's involvement with the agency and the child. However, each party furnished somewhat different perspectives on the background facts, relational issues, and procedural events.

A.
The testimony and documents presented by the agency related that in December *825 1994, shortly after DYFS became involved in the matter, J.R.A. informed the agency that M.Y.J.P. resided in Haiti and gave an address for her. On March 6, 1995, following attempts to verify the address with an international social services agency, the caseworker assigned to the matter sent a letter, written in Creole, to M.Y.J.P. On March 23, 1995, M.Y.J.P. placed a collect telephone call to DYFS. However, DYFS did not have a Creole translator in the office at that time, so arrangements were made through the international operator for personnel of the Division to call M.Y.J.P. on April 10, 1995. Meanwhile, by letter written in Creole dated March 27, 1995, M.Y.J.P. thanked DYFS and advised the Division to keep S.J.A. "where he is" because she was still in school.
On April 10, 1995, the caseworker spoke to M.Y.J.P. by telephone, through an interpreter. M.Y.J.P. admitted that she had given J.R.A. permission to take S.J.A. to the United States "for a better life." The caseworker explained that S.J.A. was in foster care and that DYFS was required to develop a permanent plan for the child. In her de bene esse deposition testimony, M.Y.J.P. maintained that the caseworker did not explain what a "permanent plan" meant, although she said she felt comforted by the caseworker's representations that S.J.A. was "fine" and "secure." According to the caseworker, in the April 10, 1995 telephone conversation, M.Y.J.P. requested that the agency return S.J.A. to Haiti; however, before the transfer process could be discussed, M.Y.J.P. withdrew the request and said that S.J.A. should remain in New Jersey where he would have a "better life." M.Y.J.P. testified, however, that she had never asked for S.J.A.'s return to Haiti, and conceded that she would not have agreed to S.J.A.'s return even if DYFS had promised to send her $100 a month for food and clothing, which they did not do. She testified: "They did not ask me that, and I would not have agreed for them to send him back. I would have preferred for him to stay over there." She also stated in her deposition: "I don't agree for my parental rights to be terminated."
M.Y.J.P. admitted that she had relatives in the United States, but refused to provide their addresses because she preferred to contact them herself. During the telephone conversation, M.Y.J.P. "pleaded" with the caseworker to assist her in obtaining a visa to come to the United States so that she could care for S.J.A. At the conclusion of the conversation, the caseworker told M.Y.J.P. to call her any time through DYFS's toll free number and discussed sending photographs of S.J.A.
The Division had no further telephone communication with M.Y.J.P., although she represented that she had attempted to call DYFS but was unable to complete the call due to the language barrier. The caseworker testified that she did not contact the Department of State, an immigration attorney, or Lutheran Ministries, because she did not believe it was DYFS's role to bring somebody from a country where there was a civil war to the State of New Jersey to parent their child. Nor did she arrange for S.J.A. to visit M.Y.J.P. in Haiti, because "neither [J.R.A.] nor [M.Y.J.P.] nor any of the other relatives indicated any desire to have that child returned for any reason to Haiti."
Thus, DYFS began to focus on attempting to reunite S.J.A. with J.R.A. because, according to the caseworker, he
would have been considered the custodial parent and he was certainly the parent that we were primarily working with. I think what drove a lot of this case[`s] decisions was the fact that [M.Y.J.P.] said leave the child there, do not send him back to Haiti. And it was *826 my understanding that there was not much the Division could do if anything,... to bring her here. So, therefore, working with [M.Y.J.P.] was pretty limited.
On her part, M.Y.J.P. failed to maintain contact with DYFS or the child from April 1995 to April 1998.
By letter written in Creole, dated February 24, 1997, DYFS advised M.Y.J.P. that because S.J.A. had been in foster care for more than two years, and because returning him to J.R.A. was "not possible," S.J.A.'s case would be referred to the Adoption Resource Center (ARC) for adoption.
By letter dated March 16, 1998, DYFS informed M.Y.J.P. that a petition for guardianship of S.J.A. was being prepared for filing, so that the child might be placed for adoption. In response, by letter dated April 15, 1998, M.Y.J.P. stated that although she did not have a "new plan," she was "waiting for the notice of the court hearing." M.Y.J.P. also requested photographs of her son, which were not sent at that time.
In April 1999, while the guardianship suit was pending, DYFS inquired with an international social services agency whether a study of M.Y.J.P.'s home in Haiti could be conducted. After learning that a home study might take three to five years to complete, DYFS determined that the child would not be permitted to return to Haiti.
In February 2000, at counsel's request, M.Y.J.P. spoke through an interpreter over the phone to S.J.A., who does not speak Creole. DYFS also mailed photographs of the child to M.Y.J.P. In April 2001, S.J.A. told the then-assigned caseworker that he did not remember M.Y.J.P. In 2001, M.Y.J.P. applied for a visa to the United States, but her request was denied.
During her de bene esse deposition, M.Y.J.P. testified to her conflicting plans for S.J.A. On the one hand, she noted her desire to have the child reunited with her in Haiti; on another, she indicated a wish merely to have the child visit with her in Haiti, and that she was agreeable to the child remaining in New Jersey but disagreed with the proposal that her parental rights be terminated.
A DYFS supervisor testified at trial that DYFS did not have a policy to assist parents in foreign countries to come to the United States. She explained that the Immigration and Naturalization Service (INS) was "very strict on their rules, on what was their province." Nevertheless, that witness conceded that in some cases DYFS had returned children to a foreign country upon receipt of a positive home study and where the parent or relative wanted the child returned.

B.
According to DYFS's records, J.R.A. had his first supervised visit with S.J.A. on December 9, 1994, approximately three weeks after foster care placement began. A second visit occurred on February 25, 1995. J.R.A. maintained at trial, however, that the caseworker assigned at the time failed to make any arrangements for visitation, and that he had had only one visit in the first three months of placement. J.R.A. also asserted that, on January 2, 1995, he had requested S.J.A.'s return, but the caseworker refused. The succeeding caseworker testified, conceding that a parent can revoke a voluntary placement agreement at any time, and that if DYFS wishes to keep a child in its care, it must petition the court within five days. However, the caseworker testified that there was no indication in DYFS's records that J.R.A. had revoked the agreement.
*827 On March 2, 1995, the caseworker met with J.R.A. and an interpreter from Lutheran Ministries to obtain a history of the family and "to make certain that [J.R.A.] understood ... why his children were in foster care and how the Division planned to move forward." J.R.A. provided some family history and admitted that he had not lived with S.J.A. prior to entering the United States. J.R.A. also asked for assistance in bringing M.Y.J.P. to the United States to care for S.J.A. but, according to J.R.A., the caseworker replied that DYFS could not do so. The caseworker then discussed available services with J.R.A. and advised him as to what would be expected in order for the children to be returned, including completing a substance and psychological evaluation, engaging in counseling, maintaining employment, and providing a safe and stable home.[5] Thereafter, from March 1995 through June 1995, J.R.A. was offered supervised bi-weekly visits with the children. According to the Division's records, he visited S.J.A. on six occasions during that period.
Meanwhile, an evaluation dated April 17, 1995, by a psychiatrist, Dr. Carlo J. Baril, reported a conclusion that J.R.A. did not need "psychiatric treatment, because there is no evidence of psychopathology." Baril noted that J.R.A.'s use of corporal punishment was very common in Haiti, where it was not viewed as child abuse. Nonetheless, Baril indicated that J.R.A. agreed to discontinue such punishment. Baril also found that J.R.A. "comes across as a very concerned and loving parent," and thus he recommended "that the children be returned to [J.R.A.] as soon as all of the evaluations are completed and that he be placed under ongoing supervision by DYFS for a period of time."
On May 18 and June 2, 1995, J.R.A. tested positive for cocaine use; and he was found to have tampered with a test on June 28, 1995. J.R.A. testified, however, that he did not start using drugs until July 1995; nevertheless, the caseworker referred J.R.A. to a drug counseling program on June 28, 1995. J.R.A. was eventually terminated from the program for noncompliance. Arrangements had also been made for him to participate in psychological counseling with a Creole-speaking therapist; however, J.R.A. was terminated from that program, too, for noncompliance.
On June 23, 1995, DYFS sent letters to four paternal relatives whom J.R.A. had identified as possible caregivers. DYFS received only one response, from relatives in Port-au-Prince, who asked for assistance in coming to New Jersey to care for the children, and if that was not possible, asking DYFS to "keep them for us while they are small and send their pictures for us." DYFS took no further action regarding placement with these relatives because it could not facilitate their entry into the United States.
In July 1995, J.R.A. pled guilty to possession of a controlled dangerous substance (CDS). From July 1995 to December 1996, he was again offered bi-weekly visitation. According to the Division's records, he saw S.J.A. fourteen times during that period.
On October 18, 1995, the court entered an order directing that S.J.A. continue in placement for six months, with a goal of reunification with J.R.A. Almost a year-and-a-half later, DYFS notified J.R.A., by letter dated March 3, 1997, that it was transferring the case to ARC.
*828 On September 10, 1997, J.R.A. was arrested and later pled guilty to possession of CDS and criminal mischief for which he was incarcerated. Meanwhile, on December 10, 1997, J.R.A. entered into a "Service Agreement/Application" with DYFS, in which he agreed, inter alia, to contact the Heartland Clinic for drug counseling.
J.R.A. visited S.J.A. only a few times in 1997 and not at all in 1998. He was incarcerated for part of that time and again in 1999. During that period, he was convicted of one theft charge and acquitted of another, separate, theft charge. On March 11, 1998, J.R.A. advised the caseworker that he did not have time to attend a counseling program and believed "it was better for him to maintain a job."
In January 1999, J.R.A. had contact with S.J.A. during a bonding evaluation. On March 30, 1999, J.R.A., who was incarcerated at that time, filed a motion seeking supervised visitation with both children. The court denied that application by order entered on May 21, 1999.
On August 11, 1999, in terminating J.R.A.'s parental rights to J.R.A., Jr., the court found, inter alia, that J.R.A. had left the child unattended, had voluntarily placed the child in foster care, had abused drugs, had failed to visit with the child, had failed to maintain employment, had failed to procure an apartment, and had engaged in physical and emotional abuse of the child. The court also found that DYFS had done everything possible to reunite J.R.A. with his son, but that J.R.A. had attended parenting classes and drug testing only sporadically, revealing an "overall picture" of an individual who was "both unwilling and unable to eliminate doing what he was doing, which would affect his care for [his] child."
On August 17, 1999, a caseworker spoke to another paternal relative who resided in the United States. That relative indicated that she had no interest in assuming custody of S.J.A. On February 8, 2000, J.R.A. told the caseworker he was unemployed and was living with friends.
Beginning shortly thereafter, J.R.A. was arrested on several occasions for shoplifting. During the year 2000 and into 2001, J.R.A. had no contact with DYFS or S.J.A.
On February 8, 2001, one of the caseworkers spoke to J.R.A. who advised her that he had just been released from jail. When questioned as to whether he was attending Narcotics Anonymous meetings, J.R.A. replied that the meetings were "a waste of time" and that he was planning to get off drugs on his own.
When J.R.A. testified at the trial in this matter, he was incarcerated. He stated that he was to be released shortly. He planned, upon his release, to return to the "room" at 15 Chambers Street in Trenton where, he said, he had resided since 1998 when not incarcerated.
In opposing termination of his parental rights, J.R.A. proposed three choices instead: first, that M.Y.J.P. be permitted to come to the United States to raise the child; second, that S.J.A. remain in long-term foster care; and third, that the child be repatriated to Haiti. On January 31, 2002, following trial but before the date of decision, INS advised the court that J.R.A. had been sent to a Louisiana federal prison to await deportation to Haiti.

C.
On March 9, 2001, John Liccardo, M.D., conducted a psychiatric evaluation of J.R.A. and a bonding re-evaluation of J.R.A. and S.J.A. to assist DYFS in determining whether S.J.A. should be adopted or returned to J.R.A. In respect of the psychiatric evaluation, Liccardo concluded that J.R.A. showed no evidence of a major psychiatric illness, but "has a mixed personality *829 disorder with prominent inadequate, antisocial and dependent traits." At trial, Liccardo defined a personality disorder as "an ingrained way of behaving." He explained that J.R.A. tended to project responsibility for his behavior onto others, and that J.R.A. had "inadequate traits" in that he was "unable to provide for himself or for his children" because he was "not secure enough to be able to cope with the stresses of working, trying to raise a family, [and] trying to meet financial obligations."
Liccardo opined that, in order to manage a personality disorder, an individual would need long-term supportive insight counseling or psychotherapy, and would need to be motivated to change. He concluded that J.R.A. was not motivated to change and had demonstrated an inability to "improve his lifestyle."
With regard to J.R.A.'s parenting ability, Liccardo evaluated J.R.A. to be incapable of meeting S.J.A.'s emotional needs. Liccardo explained that during the bonding session, J.R.A. was so "absorbed with himself and his feelings that he wanted to be reassured that [S.J.A.] hadn't forgotten him, ... loved him, ... [and] wanted to be with him," and he failed to show any "empathy as to what the children felt." Thus, S.J.A. "sensed that he's supposed to do something to make things better for [J.R.A.]." Liccardo explained that placing a child in the parental role creates feelings of inadequacy and guilt because children are not capable of performing such a role, and therefore it is "totally destructive for their emotional growth."
With regard to bonding, Liccardo found that S.J.A. was "not enthusiastic about being with [J.R.A.]" and he concluded that, at best, S.J.A. had an insecure, ambivalent bond attachment to J.R.A. Liccardo opined that if you disrupt an insecure, ambivalent bond, the child "can transfer the love and affection [he or she] needs to the [adoptive or foster family]." Liccardo explained further that a negative aspect of such a bond is that the child believes that "whatever happens, it's [his] fault."
In contrast, Liccardo stated that S.J.A. was "very positive about his experiences with the foster family" and when questioned as to how he would feel if the court determined that he would have to remain with them, S.J.A. appeared to be "relieved" and responded: "I'd be very happy." Liccardo concluded that termination of J.R.A.'s parental rights would "have next to no lasting effect" and that "[i]t would be in [S.J.A.'s] best interests to remain in a secure place where he has the love and affection of a family." Moreover, Liccardo opined, long-term foster care would not serve S.J.A.'s best interests in light of his age and his desire to be adopted.
Dr. Wendy Matthews conducted an evaluation for DYFS of S.J.A.'s "social and emotional psychological status and his relationship with his foster family." During her February 23, 2001, evaluation of the child, Matthews utilized "projective techniques," including drawings and stories which, she found, reflected the positive nature of the interactions between S.J.A. and his foster family while at the same time suggesting S.J.A.'s "ambivalence or confusion about the accessibility to the home." She noted that this latter attitude was not "surprising given [S.J.A.'s] awareness of his foster child status." Moreover, the drawings suggested "feelings of inadequacy and insecurity."
During the clinical interview portion of her evaluation, Matthews observed S.J.A. and his foster parents engaging in pleasant and respectful interrelationships, and noted that S.J.A. "was perfectly comfortable with them." Additionally, Matthews observed, S.J.A.'s foster mother "was very *830 sensitive to [S.J.A.'s] feelings and needs," and had expressed pride in his progress. Matthews defined attachment as "a reciprocal enduring emotional and physical affiliation between the child and care giver," and concluded that S.J.A. had a secure attachment to his foster mother, to whom he referred as "mother" and upon whom he relied as a child does a mother. Matthews explained that S.J.A.'s foster mother was
able to anticipate [S.J.A.'s] needs and plan for them in advance. And [S.J.A.] appears to trust that she will serve as his protector and his provider and his guide. And I saw an openness and an honesty in the communication between them which facilitates that. These qualities in a relationship are like the cornerstone of attachment and that's what children use as a foundation so that when they move into adulthood and they're establishing families of their own, they know how to do it....
According to Matthews, the disruption of this strong attachment with his foster mother would "be pretty cataclysmic" for S.J.A., who would be forced to "start from the beginning." Matthews explained that although S.J.A. had successfully adapted to the disruption in his relationship with M.Y.J.P. at a very young age, "[a]nother disruption at this critical juncture in [S.J.A.'s] life when he is just at the precipice of moving into his teenage years would do irreparable damage to him."
Moreover, Matthews opined, adoption as opposed to long-term foster care was in S.J.A.'s best interests because S.J.A.
is the only one in the [foster] family at this point who is not a permanent part of the family. Everyone else in the family has permanency promised to them but [S.J.A.]. So, he would feel different about that.
The second thing is that when a child is moving into the adolescent years, it's good for them not to have a whole lot of choices about where they might go instead. It's good for parents to say okay, you're stuck with us and we've got to make it work. That way, the tie stays tied, knotted. And the base is secure. And so as they spread their wings and mess up sometimes, they still know that the base is there. So, it helps them developmentally.
The third thing about that is that [S.J.A.] ... said I want to be adopted. I want my name to be the same last name[,] meaning I want to feel like I belong. And, he's been there six-and-a-half, almost seven years. He celebrated his ninth birthday and no one has ever promised him permanency. And... he clearly deserves permanency.
Thus, Matthews concluded, continued foster care would deprive S.J.A. of the sense of stability, permanency, and belonging that he needed.
The factual bases for the opinions rendered by Drs. Liccardo and Matthews on bonding and other relational issues between S.J.A. and the foster parents were confirmed in the trial judge's in camera interview with the child and in the testimony of the foster mother.

IV
The trial court's reasons for terminating the parental rights of both M.Y.J.P. and J.R.A. were articulated at great length, both orally and in writing. The opinions are comprehensive, cogent and compassionate. The factual findings and conclusions at the base of the termination decision are well supported by substantial, credible evidence in the record and we are, therefore, bound by them. See Cesare v. Cesare, 154 N.J. 394, 411-13, 713 A.2d 390 (1998); Rova Farms Resort, *831 Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). After reviewing the record in the light of the written and oral arguments advanced by the parties, and applying prevailing legal standards and doctrines to the facts found, we are in substantial agreement with Judge Council's expressed rationales in applying the best-interests-of-the-child standard of N.J.S.A. 30:4C-15.1a; see also Division of Youth and Family Servs. v. A.W., supra, 103 N.J. at 604-11, 512 A.2d 438, and the results he reached based thereon. The reasons articulated in respect of both parents were ample bases for terminating their parental rights. For the sake of completeness, we summarize them.
In applying the first statutory factor, N.J.S.A. 30:4C-15.1a(1), i.e., whether "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship," the court found that M.Y.J.P. had relinquished her parental responsibilities in that she had
voluntarily agreed to allow S.J.A. to come to the United States with his father, under the unrealistic expectation, that she too would be brought over to the United States....This understanding was made with M.Y.J.P.'s full knowledge that J.R.A. had a wife, who went with him to the United States. This court, however, finds M.Y.J.P.'s testimony to be incredulous in that respect.... Moreover, M.Y.J.P.'s failure to request S.J.A.'s return to her custody, even after she was advised that he was placed in foster care, by inference is evidence of her intent to relinquish her parental responsibility. Her inaction to have S.J.A. returned, supported by the unrealistic expectation that J.R.A. would bring her to the United States, led to this unfortunate situation, which prevented her from providing the essential parenting functions, which resulted in S.J.A.'s placement with DYFS.
Furthermore, the court found that M.Y.J.P. had failed to sustain a relationship with S.J.A. in that she had no contact with the child and was conflicted in her plans for caring for him. The court rejected M.Y.J.P.'s argument that she was unable to parent because she could not obtain a visa. The rejection was based on the finding that M.Y.J.P. did not apply for a visa until 2001, when S.J.A. had already been in foster care for seven years. The court considered this effort as "too little too late." Moreover, the court found that
physically being with the child was not the only way she could have expressed an interest in parenting S.J.A. While S.J.A. was in the United States, M.Y.J.P. failed to communicate with the child by phone, send letters, or small gifts through DYFS or defense counsel until this litigation had begun. M.Y.J.P. failed to make any attempt to keep the parent-child bond alive.
Thus, the court concluded that "S.J.A.'s health and development have been endangered by M.Y.J.P.'s failure to perform any parental function[.]"
Similarly, with regard to J.R.A., the court found that "J.R.A.'s lack of contact with S.J.A. due to his recurring incarcerations has resulted in J.R.A.'s failure to perform any parenting functions for S.J.A. for at least the past four years."
Applying the second statutory factor, N.J.S.A. 30:4C-15.1a(2), that "[t]he parent is unwilling or unable to eliminate the harm facing the child," and that delaying placement will add to that harm, the court found that M.Y.J.P. had failed to provide a safe and stable home for S.J.A., noting that
M.Y.J.P. asserts that at the time she gave her child to J.R.A., Haiti was in political turmoil and it was unsafe for S.J.A. to remain in the country and that *832 fact somehow should be weighed in her favor. Although the Court certainly sympathizes with M.Y.J.P., it does not mean that this Court should find that it negates her parental responsibility to S.J.A.
* * * Instead, M.Y.J.P. made the conscious and informed decision for S.J.A. to remain in the United States because she wanted to remain in school and lacked the financial means to care for S.J.A. In short, the court finds that M.Y.J.P.'s actions are demonstrative proof of her unwillingness to provide a safe and stable home for S.J.A.
That failure, the court opined, ultimately "led to the development of a strong seven-year relationship between S.J.A. and his foster family" which "should not be broken."
Regarding J.R.A., the court found that "J.R.A.'s failure to eliminate his drug addiction, as well as, his frequent incarcerations, has led to J.R.A.'s failure to eliminate the harm facing S.J.A.," that is, the absence of appropriate parenting by reason of J.R.A's drug addiction and criminal activity.
The third statutory element requires that DYFS show it has made reasonable efforts to reunite the family and had considered alternatives to termination. N.J.S.A. 30:4C-15.1a(3). The court characterized this prong as "the most significant challenge raised by [M.Y.J.P.'s] counsel." The court found
pivotal, the fact that in this case, M.Y.J.P. did not request for S.J.A. to be returned to her custody and care in Haiti. If M.Y.J.P. had demanded that S.J.A. be returned, then this Court would have serious concerns as to whether additional efforts should have been made by DYFS to M.Y.J.P. Perhaps, DYFS would have had an obligation to go further in contacting federal agencies, such as the Immigration and Naturalization Services or the United States Department of State, to facilitate the return of the child to Haiti. This Court, however, need not concern itself with that hypothetical, as the record is unequivocally clear that M.Y.J.P. communicated to DYFS that she did not want S.J.A. sent back to Haiti, but instead requested that S.J.A. stay in the United States.
Furthermore, the Court finds that the painful truth is that M.Y.J.P. had expressed to DYFS from the time that S.J.A. was placed in foster care, up until the time of these proceedings, that she had no interest in reunification and therefore, DYFS's obligation under the law must be viewed in that context.
With regard to J.R.A., the court found that DYFS had provided him with "a myriad of services," including drug counseling, supervised visitation, and psychological counseling, all to no avail.
The final statutory factor is that the "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1a(4). The court found that S.J.A.'s foster mother had expressed an unequivocal intent to adopt the child, and that the "bonding between M.Y.J.P. and S.J.A. is non-existent." Thus, the court found that "termination of M.Y.J.P.'s parental rights will not do S.J.A. more harm than good." Similarly, with regard to J.R.A., the court found that "termination of J.R.A.'s parental rights will not do more harm than good for S.J.A. and that severance of J.R.A.'s parental ties is the only viable remedy."
Finally, in this last regard, the court addressed S.J.A.'s best interests and found that S.J.A.'s right to permanency overrode M.Y.J.P.'s parental rights. The court found that it would not be in S.J.A.'s best *833 interests "to break the strong ties S.J.A. has forged with his foster mother[,] for him to be tumultuously sent back to a foreign country, with a different language, to a biological parent, who he does not even remember and could not communicate with, due to the language barrier."
As to J.R.A., the trial court noted that his drug addiction had "limited his ability to form a bond with S.J.A., thus promoting the formation of a profound bond between the child and his foster parents." J.R.A. had "allowed his drug addiction to take priority over his ability to [parent]." He had no realistic plan to care for the child and had suggested a deferral of permanency through long-term foster care so that his own relational needs could be served. In concluding that termination of J.R.A.'s parental rights was "the only viable remedy," the court found the fourth-prong-test to be satisfied because J.R.A. "is unable and unwilling to care for S.J.A. and by way of his warped rationale expects the child[] to care for him."
We find no error in the trial court's evaluations of the parenting capacities of M.Y.J.P. and J.R.A. as demonstrated by their behavior regarding their son, S.J.A., and such plans for his future as the parents may have articulated. On the merits, entry of the judgment terminating the parental rights of both M.Y.J.P. and J.R.A. was well warranted.

V
With respect to M.Y.J.P., however, this case presents independent questions of personal jurisdiction and due process uncommonly encountered in guardianship matters. There are no special factors pertaining to J.R.A. Both he and his son, S.J.A., were subject individually to the personal jurisdiction of the court.

A.
Despite the fact that the father and son are both citizens of a foreign country, their parent-child relationship was manifestly within the court's subject matter jurisdiction, and the court had personal jurisdiction over both of them. The State's parens patriae interest in the welfare of children does not spring from citizenshipor, in the term employed by J.R.A., "refugee" statusor from domicile, but rather from the presence of a child in this State for a sufficient amount of time to justify the exertion of governmental authority on his behalf for his protection. Fantony v. Fantony, 21 N.J. 525, 535-36, 122 A.2d 593 (1956); Finlay v. Finlay, 240 N.Y. 429, 148 N.E. 624, 625 (1925); see also Bergen v. Bergen, 439 F.2d 1008, 1013 (3rd Cir.1971); Helton v. Crawley, 241 Iowa 296, 41 N.W.2d 60, 73-76 (Iowa 1950). Were it otherwise, no child who is a citizen of another country or from a sister state could be eligible for state protection while present here. Neither J.R.A. nor S.J.A. were merely sojourning in New Jersey. They had moved here by J.R.A.'s choice; they had settled here; and they had resided here for fully seven years by the time the case was tried. Cf. N.J.S.A. 2A:34-28 to -52, the Uniform Child Custody Jurisdiction Act (jurisdiction in custody matters is based upon the child having resided in the State for six months or more). There is simply no basis for applying a specially limited best-interests test based on citizenship, as J.R.A. urges. New Jersey's parens patriae obligation to protect and promote the welfare of children extends to all children resident in this State, undiluted by the fact that they or their parents may be non-citizens. Fantony, supra, 21 N.J. at 535, 122 A.2d 593.

B.
The State's interest in the well-being of S.J.A. is the same in respect of *834 both of his parents, conferring subject matter jurisdiction over issues bearing upon the child's best interests. But M.Y.J.P. is in a special position. Unlike J.R.A., she was never physically subject to the jurisdiction of this court, and she argues that sufficient "minimum contacts" with this jurisdiction were lacking to support the trial court's exercise of jurisdiction over her in relation to her parental status with respect to S.J.A.
We adopt fully as supported by substantial evidence in the record made herein, see Cesare, supra, 154 N.J. at 411-13, 713 A.2d 390; Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495, the trial court's findings that M.Y.J.P. voluntarily sent S.J.A. to the United States (New Jersey) and then availed herself of DYFS's services in caring for the child. The question of first impression before us is whether the State may adjudicate M.Y.J.P.'s personal interests in her parental status, i.e., whether the State may assert personal jurisdiction over M.Y.J.P. in this regard, notwithstanding that she has never been physically present here. M.Y.J.P. raises, as well, other equally profound questions regarding the procedures developed and applied by the trial court to deal with the special circumstances of the case, arguing that they did not comport with due process requirements and were, even more generally, fundamentally unfair.

1.
Addressing M.Y.J.P.'s argument that the trial court lacked in personam jurisdiction to adjudicate the termination complaint as to her because "minimum contacts" standards had not been satisfied, Judge Council opined that the court had
obtained jurisdiction over [M.Y.J.P.'s] person by her latter actions, or lack thereof, as she refused to have the child returned to Haiti. The demand that the child remain in the State of New Jersey and continue to be cared for by the forum State clearly equates to [M.Y.J.P.'s] "purposefully availing" herself of the benefits of the forum and all its laws have to offer.
The Court concedes that [M.Y.J.P.] had never been to New Jersey nor did she specifically send her child to the State of New Jersey. More important, is the fact that the child has been a ward of the State of New Jersey since his father placed him in foster care in 1994. Clearly [M.Y.J.P.] receives the benefit of knowing that her child is being cared for without being required to perform any parental responsibility whatsoever....
Further, the court found that
[M.Y.J.P.] is requesting the State to continue to care for her child. Thus, she has "purposefully availed" herself of the benefits of the State, thereby allowing the Court to exercise personal jurisdiction. It is certainly reasonable that a parent would be haled into Court for not supporting a child as it is each parent's duty to care for his/her children. Thus, it is also reasonable that [M.Y.J.P.] be amenable to suit within the State of New Jersey....
The Due Process Clause of the Fourteenth Amendment to the United States Constitution "limits the power of a state court to render a valid personal judgment against a nonresident defendant." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L. Ed.2d 490, 497 (1980). A New Jersey court may, however, exercise in personam jurisdiction over a non-resident to the "uttermost limits permitted by the United States Constitution." Avdel Corp. v. Mecure, 58 N.J. 264, 268, A.2d 207 (1971). See also Severinsen v. Widener Univ., 338 N.J.Super. 42, 46, 768 A.2d 200 *835 (App.Div.), certif. denied, 170 N.J. 205, 785 A.2d 434 (2001).
Due process requirements are satisfied when a defendant has sufficient "minimum contacts" with the state "such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L. Ed. 278, 283 (1940)). See also Blakey v. Continental Airlines, Inc., 164 N.J. 38, 66, 751 A.2d 538 (2000); Lebel v. Everglades Marina, Inc., 115 N.J. 317, 322, 558 A.2d 1252 (1989); A.R. v. M.R., 351 N.J.Super. 512, 519, 799 A.2d 27 (App.Div.2002).

a.
We accept as a beginning point the doctrinal underpinning for the "minimum contacts" rule as offered by M.Y.J.P. Purposeful acts party, directed toward a state are required, which render it reasonable for the defendant to anticipate "being haled into court there." World-Wide Volkswagen, supra, 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d at 501. For a state court to exercise jurisdiction, a defendant must have purposely availed himself or herself "of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542 (1985). M.Y.J.P. concedes, however, that the "minimum contacts' ... principle has never been applied to a termination of parental rights matter in this State." Indeed, New Jersey follows the majority approach in cognate matters that personal jurisdiction is not required to modify an order for custody or visitation under the Uniform Child Custody Jurisdiction Act ("UCCJA"), N.J.S.A. 2A:34-28 to -52, provided that a party receives notice and an opportunity to be heard. Genoe v. Genoe, 205 N.J.Super. 6, 15, 500 A.2d at 3 (App.Div.1985).
In Genoe, id. at 13-14, 500 A.2d at 3, we cited Shaffer v. Heitner, 433 U.S. 186, 208, n. 30, 97 S.Ct. 2569, 2582, n. 30, 53 L.Ed.2d 683, 700, n. 30 (1977), as recognizing adjudications of status, such as matters pertaining to the custody of children residing here, as an exception to the "minimum contacts" requirement. 205 N.J.Super. at 13-14, 500 A.2d 3. See also Matsumoto v. Matsumoto, 335 N.J.Super. 174, 181, 762 A.2d 224 (App.Div.2000) ("[t]here is no real contest to the proposition that New Jersey has jurisdiction to decide issues relating to... custody"), aff'd as modified, 171 N.J. 110, 792 A.2d 1222 (2002)); Schuyler v. Ashcraft, 293 N.J.Super. 261, 289-90, 680 A.2d 765 (App.Div.1996) (personal jurisdiction not required when court exercises jurisdiction over custody matters), certif. denied, 147 N.J. 578, 688 A.2d 1054 (1997); Schmidt v. Schmidt, 227 N.J.Super. 528, 532-34, 548 A.2d 195 (App.Div.1988); Balestrieri v. Maliska, 622 So.2d 561, 563 (Fla.Dist.Ct.App.1993) (applying Shaffer "status" exception to custody cases); In Interest of S.A.V., 837 S.W.2d 80, 84 (Tex. 1992) (custody determinations are status adjudications not dependent upon personal jurisdiction over the parents). Cf. Ivaldi v. Ivaldi, 147 N.J. 190, 197-204, 685 A.2d 1319 (1996).
Nevertheless, neither the United States nor New Jersey Supreme Courts have expressly extended the "status" exception to proceedings involving the termination of parental rights. Other state courts remain divided on this issue, some applying a conventional minimum-contacts analysis, see In Interest of M.A.C., 244 Ga. 645, 261 S.E.2d 590, 596 (1979); In Interest of Doe, 83 Hawai'i 367, 926 P.2d 1290, 1296 (Haw. 1996); Matter of Laurie R., 107 N.M. 529, *836 760 P.2d 1295, 1297 (Ct.App.1988); In re Trueman, 99 N.C.App. 579, 393 S.E.2d 569, 570 (1990); and others applying the status exception, see Matter of Interest of M.L.K., 13 Kan.App.2d 251, 768 P.2d 316, 319 (1989); In re Williams, 149 N.C. App. 951, 563 S.E.2d 202, 205 (2002); In re Adoption of Copeland, 43 S.W.3d 483, 487 (Tenn.Ct.App.2000); In Interest of M.S.B., 611 S.W.2d 704, 706 (Tex.App.1980); State ex rel.W.A., 63 P.3d 100 (Utah 2002).
Given this State's well-established commitment to protecting the welfare of children resident here, we now hold not only that S.J.A.'s presence in New Jersey over an extended time conferred subject matter jurisdiction over questions bearing upon his welfare, including the parent-child relationship, but also that M.Y.J.P.'s conduct and related facts subjected her parental status to the jurisdictional sway of this State under the status exception, notwithstanding that she, herself, has never been present here. Apart from one fleeting request, immediately withdrawn, M.Y.J.P. never demanded S.J.A.'s return to Haiti; she had acceded to S.J.A.'s removal from Haiti to the United States, and she thereafter expressed the wish on several occasions that he remain in New Jersey subject to DYFS's care and oversight. S.J.A.'s extended period of parentally-sponsored residence in this State, i.e., almost nine years since arriving and more than eight years since M.Y.J.P. first indicated to DYFS that she wished the child to remain in New Jersey, are sufficient bases upon which to predicate this State's jurisdiction over her status as S.J.A.'s parent. We recognize and subscribe to the idea that the parties in parental termination cases, given the gravity of the issues and the relational finality of a judgment terminating parental rights, should be accorded the greatest possible protection, even more than that afforded in custody cases, which are always subject to review and modification on a changed circumstances analysis. But that is no reason not to adjudicate fully issues bearing upon a status subject to this State's parens patriae interests.

b.
Even though we have determined that the trial court's judgment was a valid adjudication of issues over which the State had acquired subject matter jurisdiction as well as personal jurisdiction by reason of the status exception, we are also persuaded that personal jurisdiction had been acquired over M.Y.J.P. in the conventional sense sufficient to overcome the preclusionary feature of the "minimum contacts" principle.
It is well established that personal jurisdiction may be specific or general, and the measure of minimum contacts required as a predicate for a valid decretal exercise depends on which type of jurisdiction is asserted. Lebel, supra, 115 N.J. at 323, 558 A.2d 1252. A court's jurisdiction is "specific" if the cause of action "arises directly out of a defendant's contacts with the forum state." Waste Mgmnt., Inc. v. Admiral Ins. Co., 138 N.J. 106, 119, 649 A.2d 379 (1994), cert. denied, 513 U.S. 1183, 115 S.Ct. 1175, 130 L.Ed.2d 1128 (1995). A court's jurisdiction is general if the cause of action "is not related directly to the defendant's contacts with the forum state," but is instead based "on the defendant's continuous and systematic activities in the forum...." Ibid. All of M.Y.J.P.'s contacts with New Jersey bore upon the subject matter of this cause of action; and the question is whether those contacts were sufficient to warrant the exercise of specific personal jurisdiction.
In the context of specific jurisdiction, whether the defendant's contacts were sufficient is determined on a case-by-case basis and depends on "the relationship *837 among the defendant, the forum, and the litigation." Shaffer, supra, 433 U.S. at 204, 97 S.Ct. at 2580, 53 L.Ed.2d at 698; Waste Mgmnt., supra, 138 N.J. at 122-23, 649 A.2d 379; see also A.R. v. M.R., supra, 351 N.J.Super. at 519, 799 A.2d 27. "The `minimum contacts' requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Blakey, supra, 164 N.J. at 67, 751 A.2d 538 (citing World-Wide Volkswagen Corp., supra, 444 U.S. at 297-98, 100 S.Ct. at 567-68, 62 L.Ed.2d at 501-02). "This `purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of `random,' `fortuitous,' or `attenuated' contact[s]," Blakey, supra, 164 N.J. at 67, 751 A.2d 538 (quoting Burger King Corp. v. Rudzewicz, supra, 471 U.S. at 475, 105 S.Ct. at 2183, 85 L.Ed2d at 542), and that she could reasonably anticipate being haled into court there. Ibid. (quoting World-Wide Volkswagen, supra, 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d at 501). "An intentional act calculated to create an actionable event in a forum state will give that state jurisdiction over the actor." Waste Mgmnt., supra, 138 N.J. at 126, 649 A.2d 379 (citing Calder v. Jones, 465 U.S. 783, 791, 104 S.Ct. 1482, 1488, 79 L.Ed.2d 804, 813 (1984)). See also Kam-Tech Sys. Ltd. v. Yardeni, 340 N.J.Super. 414, 429, 774 A.2d 644 (App.Div.2001) ("[I]t must be determined whether the defendant has purposely availed himself of jurisdiction in the forum state").
Here, M.Y.J.P. purposefully availed herself of this forum in a manner sufficient to satisfy "minimum contacts" requirements. Although M.Y.J.P. did not herself bring the child into New Jersey, she knew that the child was to be brought from Haiti to the United States; and once she learned that S.J.A. was in DYFS's care, she consistently requested that DYFS keep the child here and care for him. We continue to be mindful of the April 10, 1995 conversation with a caseworker in which M.Y.J.P. asked for S.J.A.'s return to Haiti, but she immediately withdrew that request and instead requested that S.J.A. remain in New Jersey where he would have a "better life." In her de bene esse deposition, M.Y.J.P. denied having asked the caseworker to return S.J.A. to Haiti, and claimed that she would not have agreed to S.J.A.'s return even if DYFS had promised to send her a monthly food and clothing allowance. "They did not ask me that, and I would not have agreed for them to send him back. I would have preferred for him to stay over there." By the time of the deposition, however, she said she wished to have the child returned to her in Haiti, although she preferred, as she had all along, to be permitted to enter the United States to discharge her parental duties here; but she also expressed a desire that the State continue to provide for S.J.A.'s needs.
In re Doe, supra, 83 Hawai'i 367, 926 P.2d 1290, and In re Trueman, supra, 99 N.C.App. 579, 393 S.E.2d 569, relied upon by M.Y.J.P., are distinguishable. In In re Doe, the child was born in Australia to a Philippine citizen, the mother, and an American citizen, the father. The father brought the two-to-three-month-old child to Hawaii, where he intended to resolve an issue with the Veteran's Administration. The mother returned to the Philippines, explaining that she had "reluctantly agreed" to let the father take the child because their Australian visas were expiring, and because the couple mistakenly thought the child would need a visa to accompany her to the Philippines. 926 P.2d at 1292.
Shortly after arriving in Hawaii, the father asked the Philippine Consulate to care for the child, and Hawaii's Department of Human Services sought termination *838 of the mother's parental rights. Ibid. Throughout the proceedings, the mother "regularly corresponded with the court and with social workers, pleading for the return of her [child]." Id. at 1293. On that basis, the Hawaii Supreme Court reversed the order terminating the mother's parental rights holding that the mother had "neither purposefully directed an act toward, nor availed herself of the privilege of conducting activities in, the State of Hawaii." Id. at 1297.
In In re Trueman, supra, 393 S.E.2d at 570, the children were brought to North Carolina by the mother. The father never visited the state, and his contacts were limited to sending support payments pursuant to a Wisconsin court order. Ibid. Apparently, the father never engaged in any communication with officials of the State and did not avail himself of their services or authority. These "meager contacts" were deemed "insufficient to support the exercise of jurisdiction over him" in a termination of parental rights case.
By way of contrast here, M.Y.J.P. consistently asked DYFS to care for the child. Thus, although M.Y.J.P. did not bring S.J.A. into New Jersey and did not know initially that this State was his ultimate destination, once the child was in DYFS's custody, this State provided for the child's well-being, both as it was statutorily required to do and at M.Y.J.P.'s continuing behest. M.Y.J.P. forewent her parental responsibility to care and provide for the child by not insisting upon his return to Haiti, and instead chose, even if for altruistic reasons at the time, to request and allow the State of New Jersey to step into the role of provider. In doing so, she availed herself of this State's services to provide for her child's medical, educational, physical, and psychological needs. Even at trial, M.Y.J.P. asked the State to continue indefinitely providing for S.J.A.'s needs. By taking this position consistently she certainly could reasonably anticipate that a court in this State would be called upon to act in pursuit of the State's parens patriae responsibilities for the child. See World-Wide Volkswagen, supra, 444 U.S. at 297, 100 S.Ct. at 567, 62 L.Ed.2d at 501; Blakey, supra, 164 N.J. at 67, 751 A.2d 538.
We reject M.Y.J.P.'s argument that her terse responses to overtures by DYFS cannot constitute the "purposeful" conduct sufficient to satisfy the "minimum contacts" test. In support of that argument, M.Y.J.P. cites to Kulko v. Superior Court of California, 436 U.S. 84, 94, 98 S.Ct. 1690, 1698, 56 L.Ed.2d 132, 142 (1978), (quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed2d 1283, 1298 (1958)), in which the Supreme Court stated that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." But M.Y.J.P. omits the balance of the Court's observation in Kulko, also quoting Hanson, that " [i]t is essential in each case that there be some act by which the defendant purposefully avails [him]self of the privilege of conducting activities within the forum State." Ibid. Clearly, just the fact that M.Y.J.P. responded to DYFS's overtures is not alone sufficient to satisfy minimum contact requirements. It is the content of those responses, primarily her repeated requests that this state care for her child, that suffice.
Finally, M.Y.J.P. contends that the trial court's finding of purposeful availment fails to recognize that DYFS had taken a position that it would never return the child to Haiti, and therefore M.Y.J.P.'s willingness to have the child stay here was "simply unwitting acquiescence to circumstances already beyond her control." DYFS conceded that this case had been *839 "red flagged," meaning a temporary interruption of its decision-making process calling for court review prior to the return of a child to his or her birth family. See N.J.S.A. 30:4C 61. But, as DYFS points out, there is no indication in this record that M.Y.J.P. had been aware of this development, and thus it could have played no part in her decision to allow the child to remain. There was, in short, no real effort by M.Y.J.P. to seek the child's return.

2.
M.Y.J.P. argues further that the procedures adopted by the trial court were fundamentally unfair and lacking in adherence to principles of due process of law. She contends specifically that her rights were violated by the court's failure to secure her presence at the termination hearing or arrange for her to participate telephonically. We reject those arguments, as well.
The record discloses that the court made efforts to arrange for M.Y.J.P. either to attend the trial or to participate telephonically, but was unable to effect either alternative. In an effort to make the best of a difficult situation, the court, at the close of DYFS's case-in-chief, directed that the trial be recessed to allow a Creole version of the testimony to be sent to M.Y.J.P. M.Y.J.P. was then given more than a month to review and discuss the testimony with counsel. The trial was reconvened and M.Y.J.P. was given the opportunity to recall DYFS's witnesses for cross-examination and to present a telephonic deposition and video recording, which was viewed by the court and admitted into evidence.
The United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Similarly, although Article I, paragraph 1 of the New Jersey Constitution "does not enumerate the right to due process" it nonetheless, "protects against injustice and, to that extent, protects Values like those encompassed by the principle[] of due process.'" Doe v. Poritz, 142 N.J. 1, 99, 662 A.2d 367 (1995) (quoting Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985)). Entitlement to procedural due process protections does not depend on citizenship. All persons subject to a state's authority may claim its benefits. See Mathews v. Diaz, 426 U.S. 67, 77-78, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478, 488-89 (1976); see also Jean v. Nelson, 472 U.S. 846, 872-76, 105 S.Ct. 2992, 3006-09, 86 L.Ed.2d 664, 682-85 (1985) (Marshall, J., dissenting).
Due process requires adequate notice and a fair opportunity to be heard. Matter of C.A., 146 N.J. 71, 94, 679 A.2d 1153 (1996); Borough of Keyport v. Maropakis, 332 N.J.Super. 210, 220-21, 753 A.2d 154 (App.Div.2000); Schneider v. Cty. of East Orange, 196 N.J.Super. 587, 595, 483 A.2d 839 (App.Div.1984), aff'd, 103 N.J. 115, 510 A.2d 1118, cert. denied 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986). It is a flexible concept and calls for such procedural protections as the particular situation demands. Gilbert v. Homar, 520 U.S. 924, 930, 117 S.Ct. 1807, 1812, 138 L.Ed.2d 120, 127 (1997); Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100, 114-15 (1990); New Jersey Parole Bd. v. Byrne, 93 N.J. 192, 209, 460 A.2d 103 (1983). Evaluation of whether due process requirements have been met is "an uncertain enterprise which must discover what `fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake" in the circumstances at hand. Lassiter v. Department of Soc. Servs. of Durham Cty., 452 U.S. 18, *840 24-25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640, 648 (1981).
The protections needed to ensure due process where governmental action is to be taken depend on a careful balancing of three factors: (1) identification and specification of the private interest that will be affected by the official action; (2) assessment of the risk that there will be an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) evaluation of the governmental interest involved, including the added fiscal and administrative burdens that additional or substitute procedures would require. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976); see also Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599, 607 (1982) (applying Eldridge analysis to termination proceeding); Matter of C.A., supra, 146 N.J. at 93, 679 A.2d 1153 (precise protections needed to ensure due process depends on careful balancing of Eldridge factors); Doe v. Poritz, supra, 142 N.J. at 99, 662 A.2d 367 (holding that examination of a procedural due process claim requires a court "first [to] assess whether a liberty or property interest has been interfered with by the State, and second, whether the procedures attendant upon that deprivation are constitutionally sufficient"). Although the Eldridge factors were posited for determining whether procedures used, short of an evidentiary hearing, to determine eligibility for benefits met due process requirements, they can also be applied to evaluate the due process qualities of procedures used by a trial court in place of more traditional trial processes in an effort to cope with circumstantial exigency.
The fundamental liberty interest of parents in the care, custody, and management of their children is protected by the Fourteenth Amendment. Santosky, supra, 455 U.S. at 753, 102 S.Ct. at 1390, 71 L.Ed.2d at 606. Moreover, although no New Jersey court has directly applied the Eldridge analysis to a termination proceeding, our Supreme Court has held that "[t]erminating parental rights implicates fundamental liberty interests that are protected under the United States Constitution." In re Adoption of Children by G.P.B., Jr., 161 N.J. 396, 404, 736 A.2d 1277 (1999); see also In re Guardianship of K.H.O., 161 N.J. 337, 346, 736 A.2d 1246 (1999) (parents have a fundamental constitutional right to enjoy a relationship with and raise their children). Moreover, that protection continues even when a child is placed in foster care. In re Guardianship of K.H.O., supra, 161 N.J. at 347, 736 A.2d 1246. M.Y.J.P.'s interests in this matter clearly qualify for due process protection.
The second Eldridge factor as applied in the context before us requires that we assess whether the procedures used resulted in a deprivation of rights or interests that would have been more fully protected if other procedures had been used. See Eldridge, supra, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33. Here, too, no New Jersey case has used this analysis to evaluate the procedures used in a termination case. However, in applying the second Eldridge prong to a review of a decision by DYFS regarding sexual abuse by a teacher, we have explained that application of this factor involves a determination of whether the process afforded adequate protection to the party's interests, and if not, whether additional procedural safeguards were available that would have sufficed. See Matter of Allegations of Sexual Abuse at East Park High Sch., 314 N.J.Super. 149, 164, 714 A.2d 339 (App. Div.1998). However, even if a person has a constitutionally protected interest, it does not necessarily follow that the individual must be afforded an opportunity for an adjudicatory hearing. See Eldridge, *841 supra, 424 U.S. at 332-49, 96 S.Ct. at 901-10, 47 L.Ed.2d at 31-42; In re R.P., 333 N.J.Super. 105, 113, 754 A.2d 615 (App. Div.2000).
It is well established as a matter of due process principle that procedural requirements are more demanding in parental termination cases than in ordinary civil actions, including other types of cases dealing with parental rights. See, e.g., Division of Youth & Family Servs. v. K.M., 136 N.J. 546, 557, 643 A.2d 987 (1994); In re Guardianship of A.A.M., 268 N.J.Super. 533, 543, 634 A.2d 116 (App.Div.1993); Division of Youth & Family Servs. v. V.K., 236 N.J.Super. 243, 252-53, 565 A.2d 706 (App.Div.1989), certif. denied, 121 N.J. 614, 583 A.2d 315 (1990); In re Vasquez, 199 Mich.App. 44, 501 N.W.2d 231, 234 (1993) (due process requires that the petitioner justify termination by a heightened burden of proof); Horvatich v. Texas Dep't of Protec. and Reg. Servs., 78 S.W.3d 594, 596 (Tex.App.2002) (same); In re Termination of Parental Rights to Jayton S., 246 Wis.2d 1, 629 N.W.2d 768, 775 (2001) (termination proceedings require heightened legal safeguards against erroneous decisions). But none of these cases can be taken to mandate particular procedures for all cases.
An action for termination of parental rights is a civil action. The requirements of due process do not confer a constitutional right of confrontation or mandate a parent's presence at the trial. Orville v. Div. of Family Servs., 759 A.2d 595, 599 (Del.2000) (no constitutional due process right to be present at termination hearing); In re Vasquez, supra, 501 N.W.2d at 234-35 (incarcerated parent does not have absolute right to be present at termination hearing); State ex rel. Children, Youth and Families Dep't. v. Ruth Anne E., 126 N.M. 670, 974 P.2d 164, 168 (Ct.App.1999) (due process requirements do not mandate personal appearance where parent is serving prison sentence outside jurisdiction); Cook v. Boyd, 881 F.Supp. 171, 175 (E.D.Pa.1995) (due process does not confer right of confrontation or require parent's presence at termination hearing); In Interest of Darrow, 32 Wash.App. 803, 649 P.2d 858, 861 (1982) (right to appear personally and defend not guaranteed by due process where prisoner was afforded opportunity to defend through counsel and by deposition). The question to be answered is not whether particular procedures were used, but rather whether those procedures which were employed were appropriate and adequate to protect the interests at stake.
Procedural due process standards require the opportunity for meaningful participation by the person at risk of limitation in any trial in which important rights or interests are to be adjudicated. On balance, given the circumstances of a particular case, the Eldridge factors may require an opportunity to appear in person at a hearing or trial. See Matter of Allegations of Sexual Abuse, supra, 314 N.J.Super. at 164, 714 A.2d 339 (trial type proceeding required in DYFS case with sexual abuse allegations); see also Matter of S.M., 12 Kan.App.2d 255, 738 P.2d 883, 885 (1987) (court erred in denying incarcerated parent's application to attend termination hearing). Yet, "the precise method of participation should generally be left to the discretion of the trial judge." In re Adoption of Edmund, 50 Mass.App.Ct. 526, 739 N.E.2d 274, 277 (2000) (courts should be given some flexibility, consistent with the facts of each case, in choosing from among available options, including but not limited to video or telephonic conferencing).
Due process evaluations typically call for a balancing of pertinent factors in the situation at hand. A particular situation may *842 allow for other forms of participation besides attendance, such as testimony by telephone or deposition. Other states have held that a parent who is incarcerated or otherwise prevented from attending a termination trial can be afforded due process where the parent receives notice, is represented by counsel, and is given an opportunity to testify by telephone or deposition. See, e.g., Pignolet v. State Dep't of Pensions and Sec., 489 So.2d 588, 591 (Ala.Civ.App.1986); In re Juvenile Appeal, 187 Conn. 431, 446 A.2d 808, 812 (1982); In Interest of Baby Doe, 130 Idaho 47, 936 P.2d 690, 695 (Ct.App.1997); In Interest of J.S., 470 N.W.2d 48, 52 (Iowa Ct.App. 1991); See In re Randy Scott B., 511 A.2d 450, 453 (Me.1986); In re Adoption/Guardianship No. 6Z980001, 131 Md.App. 187, 748 A.2d 1020, 1024 (2000); State ex rel. Children, Youth and Families Dep't, supra, 974 P.2d at 169; Matter of James Carton K., III, 245 A.D.2d 374, 665 N.Y.S.2d 426, 429 (N.Y.App.Div.1997); State in Interest of M.A.V. v. Vargas, 736 P.2d 1031, 1034 (Utah Ct.App.1987).
Given the somewhat unusual Circumstances attending this case, the trial court could not provide for M.Y.J.P.'s appearance or for her telephonic participation. Instead, the court carefully and thoughtfully crafted a procedure in which M.Y.J.P., who was represented by aggressive, exceptionally competent counsel, was given the opportunity to testify by de bene esse deposition, review the trial transcripts, consult with her attorney, engage in deferred cross-examination of the Division's witnesses, and present rebuttal evidence. There has been no showing that her able counsel's cross-examination was adversely affected by the fact that his client was not present in the courtroom. In fact, through her deposition taken during the course of the trial, M.Y.J.P. was able to address fully any issue raised in the proceedings, including her decision to allow S.J.A. to remain in New Jersey. Thus, the process accorded to M.Y.J.P. was adequate to protect her interests, and there is no indication that any procedural safeguards could have been implemented that would have been more fulfilling.
Matter of Allegations of Sexual Abuse, supra, 314 N.J.Super. 149, 714 A.2d 339, cited by M.Y.J.P., is clearly distinguishable. In that case the appellant, a teacher, was accused of inappropriate sexual conduct with a student.[6] The appellant sought review of DYFS's determination that the charges were "substantiated" and of its decision to include her name in the Division's central registry of substantiated abusers. Id. at 153, 714 A.2d 339. We held that the procedure accorded to the appellant, namely the right to submit a sworn statement, "was inadequate to test the charges because the outcome depended upon a credibility evaluation of [the appellant] and the witnesses against her, who she was not allowed to cross-examine." Id. at 164, 714 A.2d 339. In fact, when tested in a trial-type tenure proceeding, the appellant's accusers had been revealed as "liars and plotters." Id. at 165, 714 A.2d 339.
In contrast here, the procedural safeguards that were employed amply protected M.Y.J.P.'s rights. Thus, the second Eldridge factor weighs in favor of a determination that M.Y.J.P.'s due process rights were met.
Finally, we must consider and balance the third Eldridge factor: the government's interests, including the financial and other burdens imposed by the procedures contended to be necessary. In applying that factor, we recognize two strong concerns on the part of the State: that the *843 parens patriae responsibility to preserve and promote the welfare of the child must be seen as including the child's important interests in promptness, permanency and competent parenting; and the policy objective, based on fiscal and administrative considerations, to promote efficient and effective adjudication and reduce the cost and burden of the proceedings. See Santosky, supra, 455 U.S. at 766, 102 S.Ct. at 1401, 71 L.Ed.2d at 615; see also In re Guardianship of K.H.O., supra, 161 N.J. at 347, 736 A.2d 1246 (parental rights are not absolute and are tempered by the State's parens patriae responsibility to protect the welfare of children). The State's interests must be balanced against M.Y.J.P.'s unquestionable interest in a process with sufficient procedural integrity to protect her fundamental rights as a parent.
Within the government interest is the concern that delays in the adjudication of parental rights cases result in additional costs, and more importantly, impact negatively upon a child's need for permanency. In that regard, a New York court explained that in balancing the third factor
the children's right to a prompt determination of their status is just as important as the interest of the father, and that an indefinite delay of the children's right is a more egregious deprivation than the father's loss of his right to be present at the hearing. This right of the father is only one part of his due process rights in these proceedings, and its loss will not necessarily deprive him of a fair hearing. The risk that his absence will lead to an erroneous decision can be reduced or eliminated by permitting him to give testimony by deposition, if possible, and by his representation at trial by his attorney. The loss by the children of their day in court will, on the other hand, deprive them completely of their right to a judicial determination of their status.
[Matter of Raymond Dean L., 109 A.D.2d 87, 490 N.Y.S.2d 75, 78 (App.Div. 1985).]
See also In re Adoption/Guardianship No. 93321055, 344 Md. 458, 687 A.2d 681, 697 (if reunification is not possible or in the child's best interests, the state has a special interest and an urgent duty to obtain a nurturing and permanent placement for the child), cert. denied, 520 U.S. 1267, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997). We conclude, in summary, that the Eldridge factors were satisfied by the procedures used when weighed in the light of M.Y.J.P.'s private rights and interests and balanced with them, more particularly that the alternative measures intelligently employed by the trial court were more than adequate to deal with the issues in this case. They satisfied the "meaningful manner" due process requirement for a hearing. See Goldberg v. Kelly, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287, 299 (1970). M.Y.J.P., through able counsel, had "an effective opportunity to defend by confronting ... adverse witnesses and by presenting [her] own arguments and evidence orally," ibid., after sufficient time to confer with counsel in meeting the Division's case against her. See Nicoletta v. North Jersey Dist. Water Supply Comm'n, 77 N.J. 145, 165-66, 390 A.2d 90 (1978) (quoting Morrissey v. Brewer, 408 U.S. 471, 488-89, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484, 498-99 (1972)). Accordingly, we can find no constitutional error in the procedures employed by the trial court.

VI
We also discern no misapplication of discretion in the trial court's ruling, challenged by M.Y.J.P., admitting into evidence Dr. Matthews's testimony addressing her bonding evaluation regarding the *844 child and the foster family. M.Y.J.P. argues that without an evaluation of S.J.A.'s bonding with her, the Matthews evaluation was prejudicially incomplete. In the light of the indisputable fact that S.J.A. had no memory of his birth mother, we regard that issue to be of insufficient merit to warrant at-length discussion. R. 2:11-3(e)(1)(E). Judge Council took this view, essentially, in his detailed statement of reasons for denying the motion articulated orally on August 6, 2001. We are in substantial agreement with his decisional rationale.

VII
For the reasons we have stated, the trial court's judgment terminating the parental rights of M.Y.J.P. and J.R.A. in respect of S.J.A. is affirmed.
NOTES
[1] Issues regarding J.R.A., Jr. are not involved in this appeal. His biological mother is I.C.
[2] Given M.Y.J.P.'s lack of English fluency, it has been assumed throughout that this letter and subsequent correspondence from her in English were written on her behalf at her behest.
[3] Apparently, I.C., made no appearance in the J.R.A., Jr. guardianship matter.
[4] Because of the prohibitive cost of written translations, the court subsequently, on August 20, 2001, modified the order to provide for the presence of a Creole translator in the courtroom during trial to translate and record the testimony on a tape recorder. Provision was made for sending the tapes to M.Y.J.P. for review and consultation with counsel. The August 20 order also provided that M.Y.J.P.'s

counsel shall, at their election, either retain the services of a Haitian attorney to assist with an audio-visual deposition of [M.Y.J.P.] or conduct [her] telephone deposition.... In reference to said deposition, the Division's counsel shall be permitted to listen to said deposition at the time it is being conducted and to cross-examine [M.Y.J.P.] if necessary[.]
The August 20 order also prohibited communication among the Division's witnesses between examination and cross-examination.
[5] There is no support in the record for J.R.A.'s assertion that the Child Placement Review Board, in mid-March expressed its concern that DYFS was not acting in the child's best interests, i.e., toward reunification.
[6] The accusation was later determined to have been unfounded.