# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2865-21

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

K.N.,

     Defendant-Appellant,

and

BIOLOGICAL FATHER OF E.N.,
WHOMSOEVER HE MAY BE,

     Defendant.

_____

IN THE MATTER OF E.N.,
a minor.

_____

Submitted January 16, 2024 — Decided January 25, 2024

Before Judges Mawla, Chase, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0092-21.

Joseph E. Krakora, Public Defender, attorney for appellant (John Andrew Albright, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Renee Greenberg, Deputy Attorney General, on the statement in lieu of brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel Christian Devlin, Assistant Deputy Public Defender, of counsel and on the briefs).

PER CURIAM

Appellant K.N. appeals from a June 10, 2021 order entered following a fact-finding hearing, in which the trial court concluded she abused or neglected her son, E.N. She also challenges an April 8, 2022 order terminating the abuse or neglect litigation. Further, K.N. appeals from a July 26, 2023 order entered following a limited remand, in which we directed the trial court to make findings whether K.N. received adequate notice of an April 23, 2021 proceeding at which her defense attorney was relieved, and whether she received notice of the fact-finding hearing itself. We vacate the June 10, 2021 and April 8, 2022 orders,

2

and reverse and remand the July 26, 2023 order for further proceedings consistent with this opinion.

E.N. was born in November 2020. A relative learned of E.N.'s birth and called the Division of Child Protection and Permanency's (Division) with concerns about K.N.'s substance use. Clore Brown, a Division caseworker, called the hospital and spoke to a social worker, who reported K.N.'s urine tested positive for cocaine. E.N.'s meconium[1] test was pending but hospital staff reported he was suffering from "mild tremors, increased tone and . . . agitation." Staff also reported K.N. stated she was experiencing heroin withdrawal and was being treated for it.

Brown went to the hospital and attempted to speak with K.N. several times, but she refused to speak with him. K.N.'s nurse told Brown E.N.'s Apgar[2]

---

[1] A baby's first stool. MedlinePlus, Meconium, https://medlineplus.gov/ency/imagepages/9616.htm. E.N.'s was eventually collected and tested negative for illicit substances.

[2] A test performed immediately after a baby's birth to determine how well the baby tolerated the birthing process by measuring multiple biological functions such as breathing effort, heart rate, muscle tone, reflexes, and skin color. MedlinePlus, Apgar Score, https://medlineplus.gov/ency/article/003402.htm.

A-2865-21

and NAS[3] scores were within the normal range.  K.N. eventually spoke with Brown, told him to contact her parents, and left the hospital against the doctor's orders.

Brown had little contact with K.N. throughout the course of his investigation.  He testified she would respond to text messages and calls but "they were very brief conversations."  Brown reported "[t]he calls ended abruptly on [K.N.'s] end.  [He] was not able to fully interview her, as per protocol . . . despite [his] multiple attempts."

K.N. had a history with the Division.  Two previous pregnancies in 2015 and 2018 resulted in children born exhibiting symptoms of withdrawal.  K.N.'s parental rights to those children were terminated, and they were adopted by their maternal grandmother.

E.N. was placed with the maternal grandmother during these proceedings and K.N.'s sister visited regularly to help care for him.  K.N.'s sister expressed interest in adopting E.N.

The Division filed a complaint and order to show cause for custody, which the court heard virtually on December 9, 2020.  An attorney from the Office of

---

[3]  Neonatal Abstinence Syndrome is a group of health problems that affect a baby if it is exposed to opioids during fetal development. MedlinePlus, Neonatal Abstinence Syndrome, https://medlineplus.gov/ency/article/007313.htm.

A-2865-21

the Public Defender's (OPD's) Office of Parental Representation (OPR) appeared provisionally on behalf of K.N.  K.N. did not appear.

Through defense counsel, K.N. consented to E.N.'s removal and placement with his maternal grandmother.  K.N. also consented to a substance evaluation and agreed to follow recommendations from that evaluation and agreed to supervised visitation.

Brown's supervisor testified at the initial order to show cause hearing and stated the Division did not know K.N.'s whereabouts.  K.N. provided a physical address, but when a caseworker went there, they discovered she had never lived there.  Further, K.N. texted the Division that she would join the hearing by telephone but did not do so.

K.N. did appear by telephone at the virtual return order to show cause hearing on January 12, 2021.  OPR represented her on a provisional basis.  The court learned K.N. had tested positive for COVID-19, which delayed her substance abuse evaluation and treatment.  K.N. told the court she was considering surrendering her parental rights to her sister and brother-in-law. Pending an interstate evaluation, the Division agreed the sister would likely be the best placement for E.N.  K.N. stated she would likely not participate in the

substance abuse evaluation and treatment if she were able to make an identified surrender of parental rights to her sister.

The court held a virtual case management conference on March 23, 2021. Defense counsel indicated she was appearing provisionally and was unsure if K.N. had completed a 5A form to determine if she was qualified for public defender representation. The Division advised its investigation had substantiated K.N. for abuse or neglect. K.N. attended the hearing and stated she did not complete a 5A form and needed another copy. The court noted one had been provided with the complaint but directed the Division to email K.N. another form. K.N. stated she could print the form when she received it. The court advised her, "it is very important to do this . . . [s]o that way you can be assured of having [counsel] represent you."

On March 30, 2021, the caseworker called K.N. and left a message, reminding her to complete the 5A and email it back to the worker. K.N. never complied with these instructions.

The court held another virtual hearing on April 12, 2021. K.N. did not appear, but new defense counsel was provisionally appointed for her. The court stated K.N. needed to confirm whether she wanted representation, otherwise counsel would be unable to appear at the fact-finding hearing. When the court

inquired if defense counsel had any communication with K.N., the following

colloquy ensued:

> [THE COURT:  D]o you have any idea . . . if [K.N.] is interested in filling out a 5A[?]  Or is she even in the State of New Jersey or, you know, what the story is?  I am not looking to get involved in your client communication.  I just want to find out if [K.N.] wants to have you represent her.  To fill out the 5A.
>
> [DEFENSE COUNSEL]:  Judge, as far as I know right now, I am not able to elaborate on any of that.
>
> > . . . .
>
> THE COURT:  Are you in communication with her?  I am not asking you what the communication is.  I am just saying do you have the ability to contact her?
>
> [DEFENSE COUNSEL]:  I have the ability to use an investigator at this point to . . . try to provide her with the 5A.  That's as much as I can say, [j]udge. . . . [U]nfortunately, I was[ not] able to speak with [previous defense counsel], because she was out on vacation . . . and so now that she has returned, I can . . . try again to communicate with [her] and find out.
>
> > . . . .
>
> THE COURT:  Okay.
>
> [DEFENSE COUNSEL]: — that's all I can say.
>
> THE COURT:  Listen, I am just going to issue an order . . . that provides that [K.N.] has to . . . complete and return a 5A to the Division within [ten] days.

A-2865-21

And . . . if you can communicate with her, because the alternative for that is that she doesn't have a lawyer . . . .

Defense counsel then objected to the Division's proposed expert testimony because the expert's report was issued four months after E.N.'s birth, which was not within a reasonable time frame. Further, the report was based upon medical records that were, "themselves, not made to verify [the expert's] medical review." The court did not rule on the objection.

On April 16, 2021, defense counsel emailed the court and the Division the following:

I have not received discovery—it is due today. . . . We still do not know if the [c]ourt is going to order [me] to represent [K.N.] at the fact-finding[] or whether the [c]ourt is going to have [her] appear pro-se. I believe caselaw supports that the [c]ourt will have to address whether [K.N.] has [the] ability to represent herself pro-se.

Counsel argued if the court decided to have K.N. represent herself, the Division had to submit proof that K.N. was provided discovery pursuant to the court rules.

The Division sent defense counsel the discovery excluding the medical records two minutes later. Defense counsel responded stating she was "objecting to the expert testifying without the actual medical records being in evidence . . . ." Because "the medical records are not part of [the Division's] discovery" counsel requested an adjournment to subpoena the medical records

and retain a defense expert.  Counsel also objected to the fact-finding proceeding by way of Zoom or telephone and as it regards to K.N.'s representation, stating:

> The [c]ourt also indicated it needs a[] 5A filled out, even though [K.N.] has already indicated to this [c]ourt that she wants OPD representation.  Further it should be noted that no one is disputing [K.N.'s] qualifications for [a]ssistance of [c]ounsel by OPD.
>
> If [K.N.] is to proceed without counsel, caselaw supports that the [c]ourt will have to inquire whether she can continue pro-se.  The [c]ourt will also have to ensure she is provided [d]iscovery.
>
> For all these reasons, I'm requesting an adjournment date for June.

The Division objected to the adjournment request.  The court ordered "[K.N.] shall be provided with the 5A application within [ten] days of this order."  The order noted if K.N. "fails to complete a 5A, and is therefore without counsel, discovery will be provided to her consistent with the court rules."

On April 23, 2021, another virtual hearing was held to determine whether OPR could represent K.N.  The record reflects K.N. was not present and was "not noticed" for this hearing.  The court asked defense counsel if she believed she could continue representing K.N., and counsel replied

> [A]t this point I believe that <u>the court can continue the provisional representation if it finds that . . . my presence is essentially necessary</u>.  I do not . . . have a position . . . because I believe that's really the court's

9

determination. My job at this point is really to . . . ensure that her wishes are met[,] and <u>my understanding is that she indicated . . . to [previous defense counsel] that she wanted our representation</u>. . . . [W]ith that said I had put forward that she have due process with regards to the discovery and the complaint and . . . proper notice, which is my job at this point. . . . I have done that to the best of my ability. . . . [A]t this point, [j]udge, I believe I have to submit to the court whether the court wants me to assist her in this fact[-]finding . . . or I believe the court can . . . have [K.N.] appear pro se.

[(Emphasis added).]

The Division responded that the court should relieve OPR. It noted K.N. was served with the complaint, order to show cause, and a 5A form. The court also ordered "multiple 5As" be provided to K.N., yet she failed to complete the form. The Division argued that contrary to her representations, K.N.'s actions clearly indicated she did not want counsel. The Division noted OPR's policy was that it "cannot remain on a case provisionally if the client has not taken the affirmative step of filling out a 5A application." The Law Guardian concurred with the Division.

The court relieved OPR from representing K.N. Referencing the April 16, 2021 order, the court asked the Division if discovery had been provided to K.N. The Division confirmed discovery was served upon defense counsel, but without a valid address or fax number—and without verbal confirmation from K.N. that

10

she could open a secured email—the Division could not confirm K.N. would receive discovery. The caseworker advised that as recently as the day before the hearing, K.N. was not responding to email or phone outreach. The Division advised "we have yet to have any contact with [K.N.] since the last court hearing if not before that."

The court concluded "without a 5A" and "without the proof of [K.N.'s] indigent status" it could not appoint counsel for her. The following colloquy then occurred between the court and the Division to conclude the hearing: "THE COURT: . . . I would hope . . . that you are able to communicate in some fashion . . . with [K.N.] because we do have the fact[-]finding scheduled on Thursday. [THE DIVISION]: Yes."

The fact-finding trial was held on April 29, 2021. K.N. did not appear and she was not represented by counsel. The Division advised it emailed K.N. notice of the date and time of trial, along with discovery and exhibits, but never received a response. The Division stated defense counsel last had contact with K.N. prior to the April 23 hearing and the caseworker "has not had any contact either by phone or text message" with K.N. However, a Division contact sheet indicated K.N. contacted the caseworker for help enrolling in an inpatient

facility on April 28, 2021. Nothing in the contact sheet indicated K.N. was informed of the upcoming hearing or told that her counsel was dismissed.

The court noted K.N. was twice provided with a 5A form but did not return it to the Division or court, and "there was never even a request for an adjournment by [K.N.]." The court proceeded with the fact-finding hearing.

Dr. Gladibel Medina testified as the Division's expert in pediatric medicine. Dr. Medina based her testimony on a review of the medical records. She testified K.N. admitted using cocaine and opioids, and that K.N. and E.N. tested positive for cocaine. The hospital notes stated E.N. had "increased tone, high pitched cry . . . [and] tremors," which Dr. Medina testified were indicative of withdrawal symptoms. She explained doctors used "the Finnigan's Foreign Tool, which is the medical tool . . . to score symptoms that the baby might present, once a history of substance [use] is provided by the caregiver or someone else." E.N.'s score was twelve, which is the highest on the scale. Dr. Medina explained persistent scores above eight require treatment. She testified E.N. was treated with morphine, which improved his condition. He was weaned off morphine and his treatment ended altogether after three weeks. Although E.N.'s symptoms persisted, Dr. Medina testified it was not enough to warrant continued treatment.

Dr. Medina did not diagnose E.N. with NAS, but his symptoms were indicative of it and consistent with in utero heroin exposure. She explained that even though neither K.N. nor E.N. tested positive for heroin, the drug has a short half-life, and it is possible for an infant to suffer its effects despite the lack of a positive test in either mother or child at the time of birth.

Brown was the Division's second witness. He explained his observations in the hospital, his subsequent attempts to contact K.N., and that the Division substantiated K.N. "[b]ecause [E.N.] experienced withdrawal for several weeks because of the drug use during [K.N.'s] pregnancy."

On May 21, 2021, the Division produced a court report that chronicled the caseworker's various unsuccessful attempts to contact K.N. and connect her with services. Notably, the report stated:

> On April 29, 2021, the Division referred [K.N.] for a second time to Catholic Charities for a substance abuse evaluation. They were not able to make contact with her.
>
> The Division assisted [K.N.] in scheduling an appointment for May 6, 2021 with Catholic Charities. She did not attend the virtual appointment.
>
> The Division assisted Catholic Charities in rescheduling [K.N.] for May 17, 2021, she did not attend the virtual appointment.
>
> . . . .

> The Division continues to reach out to [K.N.] but she is not consistent with answering phone calls and does not return missed calls to [case]worker either.

The report also noted K.N. was not exercising visitation, despite a court order permitting it three times per week. K.N. told the caseworker "she does not want to see any of [her] children because it is a reminder to her that she has chosen drugs over her children."

On June 10, 2021, the court entered an order and made written findings that the Division proved K.N. abused or neglected E.N. The court found Dr. Medina's testimony "highly credible" and "straightforward." It noted she not only reviewed the medical records, but "other documents from the Division." In addition to the medical evidence, E.N.'s "diagnosis was based on the information that [K.N.] provided." The court concluded "Dr. Medina's findings were also consistent with the diagnosis of the treating physician."

The court also credited Brown's testimony. It noted he testified largely from memory, and his testimony was consistent with the Division's investigative summary.

The court found K.N. committed abuse or neglect by failing to exercise a minimum degree of care and acting with "reckless disregard for [E.N.'s] safety when she used heroin daily during her pregnancy, which resulted in [E.N.]

suffering actual harm for, at a minimum, the first three weeks of his life." The court concluded K.N. could have prevented the harm by seeking substance abuse treatment but failed to do so.

Following the fact-finding, the court conducted a virtual disposition hearing on June 15, 2021. K.N. did not appear, but was represented by OPR counsel, who indicated she received a completed 5A form from K.N. The Division stated the caseworker had difficulty contacting K.N.

On September 14, 2021, K.N. and her attorney appeared at the virtual compliance hearing. Defense counsel indicated K.N. was interested in an identified surrender of her parental rights to her sister and brother-in-law. On December 15, 2021, K.N. appeared in court with her attorney and executed the identified surrender. After the court accepted the surrender, it relieved K.N.'s counsel from representing her.

After K.N. filed this appeal, and following the initial briefing, the Attorney General moved for a temporary remand because K.N.'s brief asserted she did not receive notice of either the April 23 conference or the April 29, 2021 fact-finding hearing. The Attorney General noted this argument was raised for the first time on appeal and the "record is underdeveloped on this issue [because] no formal testimony was taken on the efforts made to provide K.N. with notice,

15

and it remains unclear if and when she was made aware of either hearing." The parties all agreed a remand was necessary to take additional testimony and adduce evidence on the notice issue "and to permit the trial court to reassess the fact-finding order in light of this evidence." Alternatively, the Attorney General argued if we determined K.N. was not given proper notice, we should vacate the fact-finding order and remand for further proceedings. We granted the motion.

On July 12, 2023, the trial court heard testimony from Division caseworker, Jalyn Rivas, about the attempts to contact K.N. in the lead up to the fact-finding. Rivas testified K.N. was difficult to reach and responded sporadically to phone calls and text messages. She would try to remind K.N. about court proceedings. Rivas said K.N. indicated she wanted to sign the 5A form and Rivas emailed it to her and "gave her a few copies of it" but it took K.N. four months to fill it out.

Rivas testified she spoke with K.N. the day before the fact-finding hearing. She explained as follows:

> I had texted her that we had—she had asked me if we had court the following day. So I called her and I confirmed that we did have court the following day. And she had expressed that she was feeling down and depressed. That she wanted to get help. We had scheduled to meet the following week so I could help get her into a substance program and then we had

decided that we would speak the following day after the court hearing.

Rivas testified she did not mention the 5A form or details about the upcoming fact-finding hearing when she spoke with K.N. the day before the hearing.

Rivas did not speak with K.N. following the hearing because K.N. did not answer her call. She "ended up going to [K.N.'s] job and helping her fill . . . out" a 5A form. Then Rivas submitted the form for processing on behalf of K.N. via email. She also testified that at no time did she believe K.N. did not know what was going on, because K.N. told Rivas she was familiar with the process because she went through it with her other two children.

Rivas informed K.N. about the April 23 conference by "phone calls." However, when the court asked Rivas to detail the number of times and dates she called K.N. about the conference and asked if she advised her "there was going to be a case management conference on April 23[], 2021[,]" Rivas responded as follows: "Not that I can recall that's documented." The court asked: "Did you make any telephone calls to [K.N.] advising her of the April 23rd case management conference that were not documented in a contact sheet or otherwise? Rivas responded: "Not that I can remember." Rivas confirmed she had neither texted nor sent a letter to K.N. about the April 23 conference and had only texted her about the April 29 hearing. When the court asked if she

had communicated with K.N. "in any way so that she would know about the April 23[], 2021 case management conference[,]" Rivas responded: "Not that I can remember. No." Rivas confirmed she spoke with K.N. about the April 29 hearing on the phone the day before and K.N. confirmed she knew about the date.

On July 26, 2023, the court issued a written opinion. The court found Rivas testified credibly. It explained "[t]he point of the [April 23, 2021] hearing was to consider whether, from a legal perspective, OPR could still represent [K.N.] at the fact-finding hearing scheduled on April 29, 2021."

The court stated because provisional OPR counsel attended the April 23, 2021 hearing, K.N.'s "interests were adequately represented . . . ." However, the court concluded it was unclear if provisional counsel communicated to K.N. that there was a conference occurring on April 23, 2021.

The court found K.N. had adequate notice of the April 29, 2021 fact-finding hearing based on Rivas's testimony and the court's April 16, 2021 order, which stated: "[T]his matter shall return to court for a fact-finding hearing on April 29, 2021, at 9:00 a.m." The order was issued while K.N. was represented by provisional counsel. Additionally, the court noted there was an April 28, 2021 text "from . . . Rivas to K.N. stating 'we have court this week,' presumably

referring to the fact-finding scheduled on April 29, 2021." The court also cited an April 28, 2021 contact sheet recording the conversation between Rivas and K.N. in which "[K.N.] thanked [the case] worker and agreed to speak to [the] worker [the following day] after the court session."

I.

On appeal, K.N. argues the trial court violated her constitutional and statutory right to counsel and deprived her of due process when it failed to ensure she had notice of the April 23 hearing and then relieved her attorney. She claims her due process rights were further violated when the court effectively compelled her to proceed pro se at the fact-finding six days later and then tried the matter in absentia. She asserts she had a right to representation at the hearing and there was no proof she voluntarily waived that right. K.N.'s supplemental brief, filed following the remand proceedings, argues the court's inability to find she had notice of the April 23 hearing at which her attorney was relieved confirms she was deprived of her right to counsel and due process.

K.N. also argues the court abused its discretion when it denied her an adjournment to retain an expert to rebut Dr. Medina's testimony, which the Division had disclosed only a few days before trial. She asserts the court's finding of abuse or neglect was unsupported by substantial credible evidence

19

because there were no medical records or testimony by the treating physicians presented to establish that E.N. suffered actual harm from NAS, or any other harm connected to her drug use.

## II.

"Due process requires adequate notice and a fair opportunity to be heard." N.J. Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super. 426, 464 (App. Div. 2003) (internal citations omitted). "Although a family court's factual findings are entitled to considerable deference . . . we do not pay special deference to its interpretation of the law . . . ." D.W. v. R.W., 212 N.J. 232, 246 (2012) (internal citations omitted).

An abused or neglected child is defined as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [their] parent . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, . . . or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4)(b).]

Our courts have treated Title Nine prosecutions as "quasi-criminal" in nature. In re Guardianship of G.S. III, 137 N.J. 168, 174 (1994). This is because

20

the ramifications for a party found liable for abuse or neglect are profound. We detailed the litany of consequences of such a finding in New Jersey Division of Child Protection and Permanency v. V.E., 448 N.J. Super. 374, (App. Div. 2017). They include listing the perpetrator's name on a child abuse directory; disclosure of abuse or neglect records upon written request to designated persons or entities, including for employment purposes, kinship care provider applications, adoption, or application to serve as a child-care placement; and "an abuse or neglect finding may provide a basis for an action to terminate a parent's custodial rights to a child." Id. at 391-94.

Viewed through this lens, we are constrained under the facts of this case to vacate the abuse or neglect finding, and remand for a new trial. Although K.N. was represented at the April 23 hearing, we are not convinced she knew about that hearing, knew her counsel would be relieved, and that she would be expected to mount a defense of the Division's case pro se, just six days later.

Our decision does not turn on the right to counsel and whether K.N. waived that right because, as the Division points out, Title Nine cases are not counsel-mandatory. Instead, our concern is grounded in assuring K.N.'s due process rights to notice of the April 23 hearing and the significant decisions that would be made in her case that day.

K.N. was not the model of a cooperative litigant. However, she demonstrated some willingness to cooperate with services. Aside from the problems caused by her addiction, the delay in her treatment was not all her own making. Having had her parental rights terminated twice before, she acknowledged the gravity of the situation when she expressed a desire to execute an identified surrender of her parental rights to E.N. Moreover, she clearly benefitted by having counsel who, on her behalf, objected to the Division's expert report.

For these reasons, we reverse the July 26, 2023 order, and vacate the April 8, 2022 and June 10, 2021 orders. If the matter is re-tried, the court shall ensure K.N. has received notice of all court events in accordance with the court rules before proceeding.

III.

Given our ruling on the notice issue, we need not reach K.N.'s argument that she was deprived of an adjournment to retain an expert. We only add that if the matter is re-tried all parties shall be afforded adequate opportunity to retain an expert. This is critical considering the ramifications of an abuse or neglect finding as we have previously discussed.

A-2865-21

Finally, we reject K.N.'s argument the Division provided insufficient evidence to meet the burden of proof by relying on Dr. Medina's report, which was a net opinion. The Division bears the burden to prove abuse or neglect by a preponderance of the evidence. N.J.S.A. 9:6-8.46(b).

The Supreme Court has held, albeit within the context of a termination of parental rights, that "[a] child born addicted to drugs and suffering from the symptoms of drug withdrawal as a result of [their] mother's substance abuse during pregnancy . . . has been harmed by the mother and that harm endangers the child's health and development." In re Guardianship of K.H.O, 161 N.J. 337, 349 (1999). However, the Court has also noted "not every instance of drug use by a parent during pregnancy, standing alone, will substantiate a finding of abuse and neglect . . . . The proper focus is on the risk of substantial, imminent harm to the child, not on the past use of drugs alone. N.J. Dep't. of Child. & Fams. v. A.L., 213 N.J. 1, 23 (2013). Therefore,

> [t]he Division can show that a newborn has been impaired in a number of ways. For example, proof that a child is suffering from withdrawal symptoms at birth could establish actual harm. . . . In addition, the Division can prove actual harm by showing evidence of respiratory distress, cardiovascular or central nervous system complications, low gestational age at birth, low birth weight, poor feeding patterns, weight loss through

an extended hospital stay, lethargy, convulsions, or tremors.

[Id. at 22-23 (internal citations omitted).]

N.J.R.E. 703 requires that expert opinion be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts . . . ." Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008) (quoting State v. Townsend, 186 N.J. 473, 494 (2006)). "The net opinion rule . . . 'forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend v. Pierre, 221 N.J. 36, 55-56 (2015) (quoting Polzo, 196 N.J. at 583).

Pursuant to these principles, we conclude the court did not abuse its discretion when it considered Dr. Medina's expert opinion and concluded the Division met the burden of proof to establish abuse or neglect. As we recounted, Dr. Medina did more than just review the medical records. Moreover, given her testimony regarding the varying effects of drugs and their ability to be detected in E.N.'s system over time, the fact she did not evaluate either E.N. or K.N. was not dispositive. It was enough for Dr. Medina to consider the treatment records

24

of mother and son from their stay at the hospital because that was the relevant time-period.

Dr. Medina's opinion was grounded in the objective evidence in the record. She correlated the evidence with her medical knowledge regarding the effects of drugs on newborns to draw the conclusion that E.N. had suffered due to K.N.'s drug abuse.

For these reasons, the court's conclusion K.N. abused or neglected E.N. by using drugs and failing to obtain treatment was supported by the substantial credible evidence in the record and was not a mistaken application of the law. However, we hasten to add that the parties should not construe our opinion as an expression of a preference on the outcome of the matter if it is re-tried and appealed once more.

Reversed, vacated, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

25